[Civ. No. 8435. Third Dist. Nov. 4, 1954.]

L. J. BARES, Appellant, v. QUINCY SANITARY
DISTRICT, Respondent.

Worthington, Park & Worthington and Leonard A. Worthington for Appellant.

Theodore G. Elges for Respondent.

VAN DYKE, P. J.—This action arises out of a contract under which appellant, a licensed general contractor, undertook to construct a sewage treatment plant for the respondent, Quincy Sanitary District. At the same time, but through other contractors, the district was constructing a sewage collection system.

The complaint contained four counts. The first was in common count form, alleging that appellant furnished materials and rendered services to respondent in "the sum of $141,614.60" and had been paid only $115,364. Recovery of the balance was prayed for. The second count pleaded a written contract to construct a sewage treatment plant and certain accessory installations. The plans, specifications and contract documents were incorporated by reference. It was alleged the work had been done and that certain extra services had been performed, so that the total thus earned amounted to $141,614.60, of which $115,364 had been paid. Recovery of the balance was asked. A third count repeated the entire second count and contained these additional allegations: That one Kennedy was the district engineer for the project and the agent of the district; that he had prepared the plans and specifications and working drawings and that in doing so he made surveys, drawings, cuts, profiles and estimates, but had negligently estimated the quantity of excavation required to be 2,000 cubic yards and the quantity of imported fill required to be 5,700 cubic yards, whereas the actual amount of excavation necessary was 4,752 cubic yards and the necessary amount of fill 9,954 cubic yards; that during the course of the work the appellant had discovered the error and called it to the attention of Kennedy who then ordered appellant to make the excavations and to provide the fill required for completion of the job, notwithstanding the fact that the amounts required exceeded the specifications and estimates; that appellant complied with the order of the engineer and on completion of the project rendered a statement for the extra yardage of excavation and fill at the prices plaintiff had under the written contract engaged to excavate and fill; that the amounts and prices were agreed to by respondent;

that the ordered excavation and fill computed at the said prices totaled $11,885. The fourth count contained these allegations: That on December 15, 1949, Kennedy had negligently and in violation of appellant's rights under his contract ordered him to cease work on the job, which order he obeyed; that as a result of this interference and the onset of winter storms which prevented resumption of labor, appellant had been forced to install pumps to protect the installations already in place at a cost of $482; that he had suffered damage to his access road leading to the job site in the sum of $600 and had been unable for a considerable time to remove heavy equipment from the job for use elsewhere, so that he lost its rental value in the sum of $5,588.

To these pleadings respondent answered, asserting that appellant had performed services and furnished materials under his contract to the value of $129,729.60, and no more, and that he had been paid in full. The allegations as to extra quantities of excavation and fill, damage negligently caused by the engineer and wrongful interference were all denied.

The trial court, sitting without a jury, heard the cause and rendered judgment in favor of respondent district. Specifically, it found that there had been no extra services; that though Kennedy had prepared plans and specifications for the work and had made surveys, drawings, cuts, profiles and estimates, yet appellant had not, in submitting his bid, relied thereon; that on the contrary appellant had examined the location before bidding, had familiarized himself with the plans, specifications and local conditions at the site and, having checked the plans and specifications, surveys, drawings, cuts, profiles and estimates had assumed all responsibility for any errors or omissions contained therein; that Kennedy had not been negligent in estimating the quantities of excavation and fill required and that in point of fact the estimates of 2,000 cubic yards of excavation and 5,700 yards of imported fill were the amounts reasonably required for the job; that the plaintiff had actually excavated the additional quantities alleged and had put in place the additional quantities of fill; that these additional quantities were necessitated by reason of the negligent manner in which appellant did the work; that there was no error in respect to either excavation or fill required by the contract; that appellant had not called Kennedy's attention to any such error; that Kennedy had not ordered any more ex-

cavation or fill than the contract itself required and that respondent had justly refused to pay appellant's claim for any extra quantities. As to the work stoppage, the court found it had been ordered by the district's engineer on account of the incidence of winter storms and freezing temperatures and that the cessation order was in line with proper engineering practices under the circumstances, was made with the consent and approval of appellant and hence that respondent had incurred no obligations to appellant for any extra costs resulting from the stoppage.

At the beginning of the trial, counsel for the appellant informed the court that they wanted to amend the complaint to bring into the issues a claim that Kennedy had negligently and also fraudulently concealed from appellant certain conditions at the site of the work and through such wrongful acts had, after appellant had been declared the low bidder, induced him to consent to a change in the location of the plant to be built; that Kennedy had represented the new site to be more advantageous, both to the district and to appellant, and that, relying upon these representations and being ignorant of the concealments, appellant had accepted the site change and agreed to perform the contract for the price bid; that in truth the new site was so affected by adverse water conditions under the surface that in order to construct it at all appellant had to install an expensive well point system to rid the site of water and had incurred in so doing extra expense exceeding $21,000. Counsel also asked leave to bring into the issues a claim that during the construction of the work Kennedy had relocated a sewer line being constructed by the other prime contractor so that it ran under a sedimentation tank that appellant was building, causing him to idle a part of his crew during the period when he had to cease work on the tank and contiguous units to enable Kennedy to correct his error by having the other contractor reconstruct the line and bypass the tank, all of which caused further damage to appellant. The trial court ruled that the complaint could not at that time be amended, but that appellant's proof as to these issues would be taken and if, in the opinion of the court, at the close they had made a case on these matters, then the court would grant leave to appellant to amend to conform to such proof. Motion to so amend made at the close of the evidence, however, was denied by the trial court.

Appellant puts the questions involved as follows:

"Is plaintiff contractor who was awarded a job which consisted of a lump sum for specified general work and also a unit price figure per cubic yard for dirt excavation and fill, for which latter the quantities were only estimated, entitled to recover:

"1. For the cubic yard quantities of excavation and fill in excess of the estimated amount, computed at the unit base price, and,

"2. For unforeseen expenses incurred as the result of the District Engineer Clyde C. Kennedy moving the job site after the bid was awarded, misrepresenting sub-surface soil conditions, concealing the results of his soil borings tests and making other on-the-job changes in the work of another contractor which delayed the progress of plaintiff's work?"

From what we have heretofore said and from appellant's statement of the questions involved, it becomes at once apparent that a fundamental issue as to the proper construction of appellant's contract is presented. We will first consider that issue. Did appellant make a lump sum bid as to excavation and fill or did he agree to do all necessary excavation and fill at prices of so much per cubic yard, quantities to be measured and pay to be based on the actual yardages required? The contract is not clear upon this subject. As is usual, the contract documents include the written bid of appellant, the plans and specifications and the formal contract agreement which incorporates within itself the other documents. This later executed instrument contains no statement of the compensation, except by a reference back to appellant's bid. That bid was made upon a form furnished all bidders and the form provided for bids upon the construction of the sewage collection system as well as the sewage treatment plant. The work to be done was broken down into schedules and the schedules contained separate items. The contained matter was ranged in columns. The first column contained the item numbers, the second column was headed "Approximate Quantity"; the third column was headed "Items with Unit Price Written in Words," and the fourth and last column was headed "Unit Price in Figures." Blanks were left wherein the bidder could insert the price bid on an item. The work finally agreed to be done by appellant and for which his bid was low was contained in the third schedule, which schedule included Items 9 to 16, inclusive. We quote

the matter appearing in Items 9 to 11, including appellant's bids:

| "Item No. | Approximate Quantity | Items with Unit Price Written in Words | Unit Price in Figures |
|---|---|---|---|
| 9 | Lump Sum | Lump Sum for the construction complete and furnishing and installing of all equipment and accessories shown on the drawings and specified for the Sewage Treatment Plant, not including imported fill material, sludge bed sand, road surfacing, outfall line, and percolation beds, ready for operation. One Hundred Sixteen Thousand Dollars | $116,000.00 |
| 9a | 2000 cu yd | Excavation at Sewage Treatment Plant area outside structure lines and below structure levels indicated on drawings, measured in place at Two Dollars and No Cents | $ 2.00 |
| 10 | 5700 cu yds | Imported earth fill for Sewage Treatment Plant area, and access road, furnished, in place, per yd at One Dollar and Fifty Cents | $ 1.50 |
| 11 | 137 cu yds | Select sand for sludge beds, in place, per cu yd at Four Dollars and Fifty Cents | $ 4.50" |

The parties were not in issue as to Item No. 9 with its "Lump Sum" bid of $116,000. Nor did appellant make any claim with respect to Item 11 and he was paid for 137 cubic yards of sand for the sludge beds at $4.50 per cubic yard. But the excavation and fill needed under Items 9a and 10 form the basis of his claim for extra yardage. Evidence was addressed to the meaning of the contract provisions as to these two items, appellant furnishing evidence that these yardage figures were approximations or estimates only. Respondent's evidence was not definite. The acts of the parties in these respects were equivocal. Respondent's resident

engineer, watching the progress of the work, said he realized at an early stage that the excavations being made by appellant, and of course the necessary backfill, were going to run the yardages much in excess of the amounts stated in the contract. He said he took it up with appellant's job superintendent, telling him that he was running into trouble because these quantities were running over. He took the position then that the excess was being caused by the manner in which appellant was doing the work, saying, however, that he could not control appellant's method so long as it did not endanger the ultimate outcome. There is no dispute but what a meeting was soon held in the office of the engineer in San Francisco to discuss the question of yardages. As to what that discussion was, the evidence is in conflict. But respondent's resident engineer testified that appellant was then flatly told that he would not be paid for yardages in excess of those stated in the contract, that is, for more than 2,000 cubic yards of excavation or for more than 5,700 cubic yards of fill and that appellant then replied that he understood, that he was glad the matter had been talked over and that he would go ahead and complete the job. In view of this testimony, the trial court was fully justified in concluding that, notwithstanding the uncertainty with which the parties were concerned, they had placed their own interpretation upon the contract terms. Therefore, the court's finding that the contract required appellant to do all necessary excavation and backfill for a compensation based upon 2,000 yards of excavation at $2.00 per yard and 5,700 yards of fill at $1.50 per yard is sustained. Perhaps there is no more certain guide for the construction of uncertain contractual provisions than the conduct of the parties themselves in respect thereto. In this case there appears to have been nothing further between the parties on the matter of compensation for excavation and fill until after the work had been accepted by respondent, at which time appellant made a written demand for payment for the extra yardages actually excavated and backfilled. We may add there was no substantial dispute in the evidence, but that appellant had in fact excavated and backfilled the excess yardages for which he claimed compensation. However, upon this record we must sustain the trial court's construction of the contract as reflected in its findings. It results that appellant was not entitled to compensation for yardages beyond those stated in the contract.

We turn now to the claims of appellant based upon the

alleged wrongful actions of respondent's engineer. ■ First, as to the shutdown, the evidence was squarely in conflict as to who ordered the shutdown. The district engineer on the job testified that about mid-January when appellant and his superintendent were on the job they decided to close it down and tentatively set a date for reopening the work on March 15th following. To the contrary, appellant testified that the job was shut down by this same resident engineer. However, on January 19th following the shutdown he wrote to Kennedy as follows:

"As per our conversation of December 27, 1949, regarding suspension of work on the subject job, due to bad weather and heavy snow, we hereby request extension of time for completion, . . .

"The job was shut down on January 13, 1950, and work will be resumed as soon as weather conditions permit."

The court found that the shutdown was ordered by Kennedy by reason of winter storms and freezing temperatures and the damage which would have resulted from said storms and temperatures "to the control unit"; that the stop order was justified; that the order of Kennedy to cease construction was made with the consent and approval of plaintiff. We think the foregoing sufficiently supports these findings. ■ But appellant, nevertheless, argues that at the time of the shutdown his work was 82 per cent completed and he testified that had he not been theretofore interfered with he would have completed it before the winter storms so that no shutdown would have occurred. The interference he complains of, however, had to do with the engineering error that resulted in a sewer line being constructed under the site of a sludge digester, necessitating a stoppage of work on that unit and related units while the sewer line was being relocated. There is no dispute but what the engineers did err in the field engineering which brought this sewer line under the digester site, but as to the extent of the delay caused the evidence is sharply in conflict. The evidence of respondent was that the relocation was accomplished in three or four days and that appellant's crews were otherwise employed in that period. In view of that evidence we cannot disturb the court's findings against appellant's contentions about the delay. The court found that as to the pumping cost of $482 and the repair of the access road, costing $600, the same were not to be charged to any dereliction of the respondent or its engineers through delaying the work and, therefore, were

costs incidental to the ordinary vicissitudes which affect such construction as was here being done by appellant. The same evidence supports the court's disallowance of appellant's claim that he was compelled to leave his heavy equipment on the job, when, if he had not been interfered with, he would have completed the work and been able to move it and use it elsewhere.

■ We come now to the appellant's contentions that have to do with his claims of fraud practiced on him by the engineer in respect of the conditions at the job site. When appellant bid the job the plans and specifications located the site and the same was inspected by bidders, including appellant, just before bids were made. After it had been determined that appellant was the low bidder the district engineer, Kennedy, concluded that the job site should be changed by moving the same about 180 feet from its specified location and changing the planned location of certain structures within the site area. The matter was discussed between appellant and the engineer and although it involved certain increased cost for piping, nevertheless the plans were amended to show the change and appellant signed an endorsement on the change sheet reading as follows: "Although there are additional costs of piping involved, we agree to accept the changes shown on this sheet, 5 R, for the prices as bid." There were certain exceptions not material here. Appellant testified that Kennedy told him the new site would be more favorable for his construction work than the old site was, that there were better subsurface conditions. He said that he relied upon these statements, knowing that Kennedy had taken borings of both the old and the new site, so that he assumed Kennedy spoke from knowledge. He testified that when they began excavating for various structures, notably the control building which had to be constructed in an excavation extending down about 20 feet from surface level, he found not only gravel underlying the surface but ran into quicksand so filled with water that he described the condition as one of bubbling wells of water. He testified that he found the area so water-filled that he was compelled to install a well point system and maintain it for months in order to rid the site of this watery condition until he could get his structures completed. Opposed to this testimony, however, was that of District Engineer Shaw, an employee of Kennedy. This man was the resident engineer for most of the construction period, had assisted in the adoption of the plans, and knew of the borings that had been taken. He testified that they wanted to make

the change because they found better subsurface conditions in respect of material in place than existed at the first site. He said all the borings had been taken at one time and that they were available to all bidders, including appellant, and would have been exhibited upon request. He said also that the site was open for bidders to make any tests, including borings, which they desired to make. Although when appellant looked over the site preparatory to making his bids it was covered with several inches of water because of which he said he could not make borings, yet another engineer witness said this would not have prevented his making borings had he wanted to do so. It does not appear that appellant ever asked to see the borings record. It does not appear that he was unaware that borings had been made. It does not appear affirmatively that the borings actually showed the subsurface water content which appellant discovered when he went to work. Appellant furnished no evidence that the new site had worse water conditions than the first site. He complains that the record of borings taken by Kennedy was not produced at the trial, but it appears that he did not demand that they be so produced. Upon the whole record, therefore, it appears that appellant presented weak proof, if he did not wholly fail to prove, that Kennedy was guilty of wrongful conduct in obtaining appellant's consent to the change of site. The court is not shown by the record to have made any order granting or denying the motion to amend. The case was decided, however, on the pleadings as they stood before and during the trial. The parties in their briefs have assumed a denial. We will treat it so. Did the court err? No formal written draft of the proposed amendment was ever presented. Orally, at the beginning of the trial, counsel for plaintiff said it was proposed to amend by adding to the pleading of the third cause of action "language that further by reason of the negligence of said Clyde C. Kennedy the plaintiff was damaged in the sum of $21,792.55 for expenses of well point operation." More than a year passed between settlement of the pleadings and the trial. The motion to amend at the beginning of the trial, over the objection of defendant, was addressed to the court's discretion. (Code Civ. Proc., § 473; see also cases cited in West's Cal. Dig. Title "Pleading," § 236(5).) In view of the foregoing, and assuming the proof made would have supported findings by the trial court favorable to appellant's contentions, we hold that the record here furnishes no founda-

540

tion for a holding that the trial court abused its discretion in refusing the amendment. (*Rhodes* v. *Bush*, 121 Cal.App. 137, 141-142 [8 P.2d 542].)

We have been at pains to carefully examine the record in this case and upon the whole record we are compelled to hold that the judgment of the trial court is substantially supported throughout.

The judgment appealed from is therefore affirmed.

Peek, J., and Schottky, J., concurred.