[L. A. No. 25973. In Bank. Oct. 31, 1960.]

L. C. BOHMAN, Respondent, v. PHIL BERG, Appellant.

Gang, Kopp & Tyre, Martin Gang, Payson Wolff and Frank G. Wells for Appellant.

Curran, Golden & McDevitt and Robert O. Curran for Respondent.

PETERS, J.—Plaintiff brought this action to recover the value of services, labor and materials furnished to the defendant. The trial court held that the reasonable value of the work, labor and services performed and the materials furnished was $46,004.75, of which $31,820.05 had been paid. Judgment was therefore entered for plaintiff for the sum of $14,184.70, plus interest. Defendant appeals.

Plaintiff is a custom auto body builder and metal fabricator. Early in 1954 the defendant purchased a Greyhound bus from the Greyhound bus company. He then engaged the plaintiff to convert the bus into a luxurious "land yacht." Plaintiff and defendant held numerous conferences concerning the various items which defendant wished to have constructed and installed. Defendant had several detailed plans and blueprints prepared which were delivered to the plaintiff. On April 7, 1954, plaintiff sent a letter to defendant which read, in part:

"Dear Mr. Berg:

"I have tried, to the best of my ability, through our conversations, your notes, and Mr. Haines' drawings and specifications to draw up an agreement as complete as possible regarding your G. M. Land Yatch [sic], it is difficult to include every item and doubtlessly some have been overlooked.

If so, these items will be picked up as we progress." The letter listed the items of work to be performed by the parties.

Defendant "rephrased" the list, added to it in many respects, and returned the revised version to the plaintiff for his approval. Plaintiff signed the agreement on April 19, 1954.

This agreement provided that defendant was to be charged $4.00 per hour for all metal men and $4.65 per hour for all cabinet men. In addition he was to be charged 10 per cent above cost for all outside labor and materials. The agreement specifically provided that the total cost was not to exceed $25,000, plus sales tax.

The work to be performed under the agreement was specified as follows:

"A. ALTERATIONS ON STRUCTURE

"1. Items to be omitted and added as per General Motors blue prints and specifications submitted by Ferdinand Eichner, Development Engineer of General Motors.

"2. Alterations to be done by you:

"A. Revamp front roof structure to accommodate observation dome.

"B. Install new side windows as per plans.

"C. Install new door or rework present emergency door for starboard side.

"D. Enclose existing emergency door exit on port side.

"E. Rework baggage compartment doors as required, for ventilation.

"F. Dress up driver's compartment.

"All materiel [sic] needed for altering the exterior of bus is to be purchased from General Motors, and is to be supplied by me, with the exception of the enclosed list provided by Eichner, and which you are to purchase locally.

"B. THE FOLLOWING ITEMS ARE TO BE PURCHASED AND INSTALLED BY YOU:

"1. 10 KW Generator as specified by me.

"2. Monel tanks for water, gasoline and oil, approximately as per plan.

"3. One heavy galvanized sump tank.

"4. Heat booster.

"5. Rectifier.

"6. Converter with trickle charger.

"7. Electric water heater or heaters approximately 24-30 gallons—Columbia or Rheem or equivalent.

"8. All tanks to be mounted in hardwood cradles covered with leather.

"9. Generator to be shock mounted and possibly on tracks with aircraft type connections for access.

"10. All plumbing, fills, drains, gate valves, etc.

"11. Electric circuit breakers (coordinate 12 and 112 volt circuits), wiring, etc.

"12. Ultra violet purification light.

"13. Small 110 volt electric water supply plump [sic]—1 inch.

"14. Partition spaces in baggage compartment in aluminum to accommodate above items and those specified in Mr. Haines' and Mr. Eichner's blueprints and instructions.

"15. Install complete stainless steel galley, satin finish, including range, oven, combination day box and freeze, sink with 'Pat' type disposall [sic], vent, cabinets, etc.

"16. Install table in lounge with hydraulics as per drawing.

"17. Arrange to raise half of bunk in cabin by hydraulics if possible; if not feasible, by counterweight, as per plan.

"18. Construct step table in cabin as per plan.

"19. Install two heads as per plan, including 'Pat' toilets, enclosed lavatory and shower, both heads in satin finish stainless.

"20. Purchase and install two Motorola radios. In after radio it is contemplated we will use the same speaker as is used by the television which we will furnish and the controls thereon will be recessed. Forward radio will be ordinary automobile type installation.

"21. Supply not over two locks for exterior doors of bus, and not more than three locks for certain spaces in the interior.

"22. Compartment certain lockers to accommodate china, glasses, etc.

"23. Build additional storage space not on present plans, if in our mutual opinion there is space and this is feasible.

"C. WORK NOT SPECIFIED ON PRINTS TO BE FURNISHED AND INSTALLED BY C. BOHMAN AND SON.

"1. Observation dome.

"A. Rework and install complete 1954 Ford or Mercury Skylark top, windshield, back light, movable front vent windows and side windows which will remain stationary. If possible, use Ford or Mercury garnish mouldings, etc. in the interior. Headlining in leatherette same as overhead of bus.

"2. Front upper destination space to be reworked, as per my approval.

"3. Interior to be built as per Haines' plan. Haines is to furnish two movable chairs not called for in plan, five lamps as per plan, drapery material, upholstery material for couches and bunks, and leather to be used on shelf across rear of lounge. You are to furnish cork floor covering, parkwood, imitation leather for overhead, hardware, tracks for drapes, and other construction materials for interior as per Haines' plan. Your upholsterer is to do the requisite upholstering and drapery work with materials supplied by Haines.

"4. Install shower portside exterior as discussed.

"5. Install roof ventilators as needed.

"6. One 10′ x 14′ nylon sailcloth awning and stanchions on starboard side.

"7. Yoke for Willys Station Wagon to be fabricated by you.

"8. I have purchased a Jeep Station Wagon, the exterior of which you are to rework to make this wagon conform in appearance with the bus.

"9. You are to construct a car lift and carrying apparatus for a boat which I am to purchase to be carried on the roof of the station wagon.

"10. Catwalk if needed.

"11. I am to furnish television set with remote control which you are to install as per plan.

"12. Personal equipment, outboard motor and outdoor furniture I will furnish."

During the period of July 29, 1954, to November 2, 1954, five bills totaling $25,820.05 were sent to the defendant. Charges were made at the rates specified in the agreement of April 19th. All of these bills were paid immediately. The bus was ultimately completed and delivered, although defendant contends that some of the work was done improperly.

As the work progressed several changes were made in the original plans, and numerous additions were made. On or about December 15, 1954, plaintiff informed defendant that the cost of remodeling the bus would be in excess of the $25,000 maximum specified by him. In January and February of 1955 defendant paid plaintiff an additional $6,000. He refused to pay any of the other bills which were sent to him. Plaintiff then brought this action to recover the reasonable value of the entire remodeling job.

Defendant contends that the trial court erred in holding

that the letter of April 19th was too indefinite and uncertain to constitute a contract. He contends that at the time this agreement was executed both he and the plaintiff clearly understood what each item in the agreement represented in terms of actual performance. Defendant readily concedes that many additional items (hereafter referred to as "extras") not contained in the agreement were installed in the trailer. He also concedes that some of the items contained in the agreement were installed differently than originally anticipated at the time the agreement was executed.

He is willing and has offered to pay to plaintiff the reasonable value of the "extras" and any additional cost incurred by virtue of the modification of any item contained in the agreement. He has already paid $6,820.05 in addition to the $25,000 contract price. But defendant contends that he is obligated to pay no more than the $25,000 price designated by the agreement of April 19th for the installation of those items enumerated therein and which were installed in the manner contemplated by the parties on April 19th. He contends that the additions and modifications, for which he is willing to pay the reasonable value, should be segregated from the items covered by the April 19th agreement. This contention is meritorious.

The trial court rendered judgment for plaintiff for the reasonable value of *all* of the work, labor, services and materials furnished by plaintiff. The lower court concluded that the agreement of April 19th "was incomplete, indefinite and uncertain so that there was never any agreement or meeting of the minds of the parties with respect to the proper methods, materials and workmanship to be used in order to convert the General Motors bus into the land yacht desired by defendant, and that the same were incapable of ascertainment; that the work proposed to be done by the parties was largely novel and pioneering in nature; that the provisions of any letter or the plans and drawings referred to therein, together with the conversations of the parties prior to April 19, 1954, were wholly inadequate to call for the work which was done by plaintiff, and that on April 19, 1954, it was impossible to ascertain just how much work would have to be done by plaintiff or the method by which it would be accomplished." The court therefore refused to permit defendant to segregate the modifications and additions from the contract items.

The holding that the agreement was too indefinite and uncertain to permit a meeting of the minds, and that the

methods, materials and workmanship "were incapable of ascertainment" is erroneous. It is unquestionably true that completion of the trailer became a far more complex and difficult task than either party contemplated. But this does not alter the fact that the parties, with full knowledge of the experimental nature of the undertaking, voluntarily entered into an agreement which *they* understood, by which *they* intended to be bound and which was eventually performed.

Mr. Bohman and Mr. Berg had numerous discussions prior to April 19th concerning the work to be done. Extensive and detailed plans and blueprints were furnished to Mr. Bohman. He testified at the trial that when he signed the letter of April 19th he *fully understood what was intended by each provision in that agreement and that he fully intended to be bound* by it. It is therefore obvious that there was a meeting of minds at the time the contract was executed.

In *Bettancourt* v. *Gilroy Theatre Co., Inc.,* 120 Cal.App.2d 364 [261 P.2d 351], the defendant contracted to build a "First class Theatre." He failed to perform and the plaintiff sued for damages. A vice-president of the defendant testified that when he executed the agreement a " 'first-class theatre' meant to him 'to erect a comfortable theater in Gilroy, according to the code required to build a theater in Gilroy. . . .' " (*Id.* at p. 368.) The court held that the contract was sufficiently definite and certain, pointing out that *defendant* had been able to understand what it had undertaken to do.

This is also true of the present case. Plaintiff fully understood what the terms of the agreement obligated him to do. Numerous details had to be worked out as construction progressed, but this fact does not render the agreement unenforceable. Plaintiff did not at any time inform the defendant that he did not know what he was expected to do. He proceeded to do the work required by the agreement and to bill defendant as agreed. Hence the parties themselves understood the contract when they entered into it, and at least for some time thereafter. There can be no clearer refutation of the claim of indefiniteness.

This is not a case where specific performance is involved, nor is this an action for damages caused by the failure to perform. This case involves a contract which, with certain modifications and additions, *has been fully performed* by the parties. ▆▆▆ It is well-settled law that, although an agreement may be indefinite or uncertain in its inception, subsequent performance by the parties under the agreement will

cure this defect and render it enforceable. When one party performs under the contract and the other party accepts his performance without objection it is assumed that this was the performance contemplated by the agreement. (See *e.g.*, 1 Corbin, Contracts (1950) § 101, p. 319; 1 Williston, Contracts (Jaeger 1957) § 49, p. 158; *Tanner* v. *Title Ins. & Trust Co.*, 20 Cal.2d 814, 823 [129 P.2d 383]; *Bares* v. *Quincy Sanitary Dist.*, 128 Cal.App.2d 530, 536 [275 P.2d 827]; *Bettancourt* v. *Gilroy Theatre Co., Inc., supra*, 120 Cal.App.2d 364 [261 P.2d 351]; *Mason* v. *Rolando Lumber Co.*, 111 Cal.App.2d 79 [243 P.2d 814]; *Hunter* v. *Sparling*, 87 Cal.App.2d 711, 725 [197 P.2d 807]; *Weintraub* v. *Soronow*, 115 Cal.App. 145, 151 [1 P.2d 28]; 1 Witkin, Summary of California Law, § 221, pp. 249-259; *Eastern Woodworks* v. *Vance* (1955), 206 Md. 419 [112 A.2d 231, 235]; *Harris* v. *Kirshner* (1949), 194 Md. 139 [70 A.2d 47, 49]; *Perreault* v. *Hall* (1946), 94 N.H. 191 [49 A.2d 812, 813]; *Roessler* v. *Burwell* (1934), 119 Conn. 289 [176 A. 126]; *Palumbo* v. *George A. Fuller Co.* (1923), 99 Conn. 353 [122 A. 63, 67]; *Platts* v. *Arney* (1955), 46 Wn.2d 122 [278 P.2d 657]; *Harlow Pub. Co.* v. *Patrick* (1937), 181 Okla. 83 [72 P.2d 511]; *Woodward* v. *Vegetable Packing House* (1958), 4 Wis.2d 36 [90 N.W.2d 586]; *Nelson* v. *Farmers Mutual Auto. Ins. Co.* (1958), 4 Wis.2d 36 [90 N.W.2d 123, 131]; *Johnson* v. *Quaal* (1957), 250 Minn. 154 [83 N.W.2d 796]; *Waites* v. *Miller* (1928), 244 Mich. 267 [221 N.W. 171, 173]; *Smithereen Co.* v. *Renfroe* (1945), 325 Ill.App. 229 [59 N.E.2d 545]; *Jackson* v. *First Nat. Bank & Trust Co. of La Porte* (1944), 115 Ind.App. 313 [57 N.E. 2d 946]; *Clark* v. *J. & C. Auditore* (1927), 244 N.Y. 382 [155 N.E. 679] (did parties intend to be bound by this agreement); *Beni* v. *Frasca* (1940), 259 App.Div. 844 [19 N.Y.S.2d 223, 228]; *Hooper* v. *Bell* (1948, Tex.Civ.App.), 210 S.W.2d 870, 875; *Casper Nat. Bank* v. *Curry* (1937), 51 Wyo. 284 [65 P.2d 1116, 110 A.L.R. 360]; *General Paint Corporation* v. *Kramer* (10th Cir., 1932), 57 F.2d 698.)

This rule is in accord with the cardinal rule of construction that when a contract is ambiguous or uncertain the practical construction placed upon it by the parties before any controversy arises as to its meaning affords one of the most reliable means of determining the intent of the parties. (*Jackson* v. *First Nat. Bank & Trust Co. of La Porte, supra*, 115 Ind.App. 313 [57 N.E.2d 946, 947].) As was said in *Mitau* v. *Roddan*, 149 Cal. 1, 14 [84 P. 145, 6 L.R.A. N.S. 275]: ". . . [I]n all cases where the terms of their contract,

or the language they employ, raises a question of doubtful construction, and it appears that the parties themselves have practically interpreted their contract, the courts will follow that practical construction. It is to be assumed that parties to a contract best know what was meant by its terms, and are the least liable to be mistaken as to its intention; that each party is alert to his own interests, and to insistence on his rights, and that whatever is done by the parties contemporaneously with the execution of the contract is done under its terms as they understood and intended it should be. Parties are far less liable to have been mistaken as to the intention of their contract during the period while harmonious and practical construction reflects that intention, than they are when subsequent differences have impelled them to resort to law. . . . The law, however, recognizes the practical construction of a contract as the best evidence of what was intended by its provisions." (See also *Haughawout* v. *Raymond*, 148 Cal. 311, 312 [83 P. 53]; *Gray* v. *Cotton*, 166 Cal. 130, 134 [134 P. 1145]; *Bird* v. *American Surety Co.*, 175 Cal. 625, 629 [166 P. 1009]; *McCartney* v. *Campbell*, 216 Cal. 715, 719-720 [16 P.2d 729]; *Lemm* v. *Stillwater Land & Cattle Co.*, 217 Cal. 474, 481 [19 P.2d 785]; *King* v. *Moore*, 220 Cal. 449, 457 [31 P.2d 377]; *Universal Sales Corp.* v. *California etc. Mfg. Co.*, 20 Cal.2d 751 [128 P.2d 665]; *Woodbine* v. *Van Horn*, 29 Cal.2d 95, 104 [173 P.2d 17]; *Barham* v. *Barham*, 33 Cal.2d 416, 423 [202 P.2d 289].)

When the parties perform without objection under a contract the terms of which appear to be indefinite, they have indicated that its terms were sufficiently certain so that they, at least, could perform it. The conduct of the plaintiff in constructing and installing the items enumerated in the agreement of April 19th indicates that in his mind the contract was not too indefinite to be performed. He held himself out as a custom contractor. He was familiar with defendant's desires and expectations. He testified that he understood what the agreement of April 19th obligated him to do. And he proceeded to do it. He cannot now challenge the validity of the agreement in order to obtain a larger fee than that to which he originally agreed. (See *Eastern Woodworks* v. *Vance, supra*, 206 Md. 419 [112 A.2d 231, 235]; *Standard Iron Works* v. *Globe Jewelry & Loan, Inc.*, 164 Cal. App.2d 108, 118 [330 P.2d 271]; *Haggerty* v. *Warner*, 115 Cal.App.2d 468 [252 P.2d 373]; *Rutherford* v. *Standard Engineering Corp.*, 88 Cal.App.2d 554, 561 [199 P.2d 354]; *Mac-*

*Donald* v. *Rosenfeld,* 83 Cal.App.2d 221, 238 [188 P.2d 519];
*Thompson* v. *M. K. & T. Oil Co.,* 5 Cal.App.2d 117, 121 [42
P.2d 374]; *Weintraub* v. *Soronow, supra,* 115 Cal.App. 145,
151 [1 P.2d 28].)

The trial court was correct when it stated "The work proposed to be done by the parties was largely novel and pioneering in nature. . . ." It is also true that neither the agreement of April 19th nor the many plans and specifications included all of the details of the work to be done. Some things were necessarily left to experimentation and future consideration. But the protection of a binding contract is not afforded merely to common and ordinary projects (*Cf. Mantell* v. *International Plastic Harmonica Corp.* (1947), 141 N.J. Eq. 379 [55 A.2d 250, 173 A.L.R. 1185]; *Laveson* v. *Warner Mfg. Corp.* (D.C., N.J. 1953), 117 F.Supp. 124).

█ It is entirely reasonable for parties to desire to be protected by binding agreements covering the construction of new and novel projects. Both parties in the present case knew that their venture was unusual and that details might have to be determined by trial and error. Certainly, the plaintiff knew this. He also knew that defendant did not intend to pay more than $25,000 for the work called for under the agreement. He accepted the risk that the experimental nature of the project might result in unexpected cost to him when he agreed to accept a maximum figure for the completion of the work contemplated in the agreement. He cannot now claim that because this risk materialized he is entitled to receive more than the contract price.

█ " 'The law does not favor but leans against the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if that can be ascertained. . . .' " (*McIllmoil* v. *Frawley Motor Co.,* 190 Cal. 546, 549 [213 P. 971]; *Sutliff* v. *Seidenberg, Stiefel & Co.,* 132 Cal. 63 [64 P. 131, 469]; *Roy* v. *Salisbury,* 21 Cal.2d 176, 184 [130 P.2d 706]; *California Lettuce Growers* v. *Union Sugar Co.,* 45 Cal.2d 474, 481 [289 P.2d 785, 49 A.L.R.2d 496]; *Roberts* v. *Adams,* 164 Cal.App.2d 312, 314 [330 P.2d 900]; *Belcher* v. *Williams,* 151 Cal.App.2d 615, 620 [311 P.2d 861]; *Mancuso* v. *Krackov,* 110 Cal.App.2d 113 [241 P.2d 1052].) █ In the present case both parties clearly understood what was meant by the terms of their agreement. The plaintiff subsequently performed under the terms of the agreement. He is

therefore bound by all of the terms of that contract, including the price established therein.

*Dodge* v. *Harbor Boat Bldg. Co.*, 99 Cal.App.2d 782 [222 P.2d 697], relied upon by plaintiff, is clearly distinguishable. In that case the court held that "the original specifications and directions with respect to the work were altered and supplemented so extensively and in so many material particulars as to render it impossible for the trial court to segregate the work originally agreed to be done. . . ." (*Id.* at p. 790.) In the present case the plaintiff himself, on the witness stand, enumerated the work which was "extra." He also testified to the changes which were made in the items included in the agreement. It is therefore obvious that the modifications and additions to the contract can be segregated from the terms of the contract itself, and that the reasonable value of the former can be ascertained.

 Plaintiff is entitled to, and has received, the contract price for the work done pursuant to the contract of April 19th. He is also entitled to recover the reasonable value of the work, services and materials furnished by him for the work not included in the contract, that is, for the "extras," as well as for any additional cost involved in modifying the items included in the contract. The trial court erroneously refused to permit defendant to introduce testimony on these matters. Defendant has already paid $6,820.05 in addition to the contract price, and this sum is to be credited against the amount due to the plaintiff as the reasonable value of the extra work performed.

The judgment is reversed, and the case is remanded for further proceedings not inconsistent with the views expressed herein.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., White, J., and Dooling, J., concurred.