[Civ. No. 28474.   Second Dist., Div. Two.   Apr. 26, 1965.]

SAMUEL E. LUNDEN, Plaintiff and Respondent, v. THE COUNTY OF LOS ANGELES, Defendant and Appellant.

Harold W. Kennedy, County Counsel, and Lloyd S. Davis, Chief Trial Deputy, for Defendant and Appellant.

Musick, Peeler & Garrett and Bruce A. Bevan, Jr., for Plaintiff and Respondent.

HERNDON, J.—Defendant, the County of Los Angeles, appeals from the judgment entered against it following a non-

jury trial of an action brought by respondent to recover the reasonable value of the portion of the architectural services which he had rendered in conformity with the provisions of a written contract and which remained uncompensated at the time said contract was cancelled by the appellant.

Since the facts are undisputed, the issue presented for our determination is a legal question which can be stated in relatively simple terms. All but one of appellant's assignments of error are predicated upon its interpretation of a rather incomplete and poorly adapted form of contract—an interpretation which the trial court rejected and which we also find unacceptable.

Appellant does not deny that respondent, in good faith, actually performed valuable and unrewarded services, nor does it argue that the judgment now under review is in any real sense inequitable or unjust. The county's principal contention is that the contract necessarily must be so construed as to bring into operation section 32 of article IV of the state Constitution[1] and section 23006 of the Government Code.[2] As indicated, appellant argues that said statutory and constitutional provisions are operative and that their effect is to prohibit any payment for the services in question.

We shall undertake now to develop the relevant facts and to state as clearly as we can the reasons which properly impelled the trial court to reject appellant's arguments and to render the judgment which we are about to affirm.

On March 28, 1956, appellant entered into an agreement with respondent to obtain the benefit of his architectural services in connection with the development of an air conditioning plant for the Los Angeles County General Hospital. The agreement was prepared by the county counsel by means of typewritten insertions upon the printed form of a "standard" architectural contract.

---

[1]Section 32 of article IV of the state Constitution reads as follows:
"The Legislature shall have no power to grant, or authorize any county or municipal authority to grant, any extra compensation or allowance to any public officer, agent, servant, or contractor, after service has been rendered, or a contract has been entered into and performed, in whole or in part, nor to pay, or to authorize the payment of, any claim hereafter created against the State, or any county or municipality of the State, under any agreement or contract made without express authority of law; and all such unauthorized agreements or contracts shall be null and void."

[2]Section 23006 of the Government Code reads as follows: "Any contract, authorization, allowance, payment, or liability to pay, made or attempted to be made in violation of law, is void, and shall not be the foundation or basis of a claim against the treasury of any county."

In the usual or ordinary architectural agreement, for which the standard form was designed, the general scope and nature of the project presumably are rather definitely fixed in advance. It is therefore possible to break down the architect's performance into five successive stages and to provide for installment payments upon the completion of each stage with the assurance that these installments will be roughly equivalent to the percentage of the services completed from time to time.

In the instant case, however, the ultimate extent or scope of the contemplated project was undetermined at the time the agreement was entered into, and to a large degree, respondent's services were intended to be, and actually were, directed to the purpose of assisting the county in developing and determining what the general scope of the project should be. The contract itself provided as follows:

"[T]he County intends to construct a Central Air-Conditioning Compressor Plant, located at the Los Angeles County General Hospital, 1200 North State Street, Los Angeles, California, *for all existing and future requirements of said hospital,* as determined by the Chief Administrative Officer of the County, *based on a Comprehensive Engineering and Economic Analysis Report to be prepared by the Architect.* Said report shall contain sufficient detailed drawings and estimates for the accurate determination of initial cost, operating cost, and additional construction requirements as the Los Angeles County General Hospital develops. The drawings and details shall include distribution system, project location, and plant layout; and this facility shall provide all necessary appurtenant work for a completely operable plant; all hereinafter referred to as the project." (Italics added.)

By the terms of the agreement, the "tentative estimate of construction cost" was stated to be $1,000,000, but it is undisputed that this round figure was used merely to give substance to the initial agreement and bore no particular relationship to the eventual construction cost which would be determinable only after the general scope of the project had been fixed by the board, in part, upon the basis of estimates to be developed as products of the above described services to be rendered by respondent. In this connection, the agreement provided:

"The General Scope of the Project shall be defined by the Board, by resolution in accordance with the Schematic Plans approved by the Board, and said general scope as thus defined shall automatically become a part of this contract as though

fully set forth herein, or it may be defined by written amendment to this contract. In the event the County desires to increase the scope of the work and the tentative estimate of the construction cost, then the Board may, by resolution, authorize such increase in the scope of the work and tentative estimate of construction cost."

Respondent was to receive as compensation 6¼ per cent of the eventual tentative estimate of construction cost. The agreement also contained a provision relating to "Extra Services," but this section had no direct applicability in the instant case since it did not relate to the services to be performed by the architect in order to assist the county in determining the actual scope of the work desired, and, until this had been done, there obviously would be nothing to which the term "extra," as used in this section, could rationally be referred.

By December 28, 1956, respondent had submitted to appellant the schematic plans which marked the first stage in the development of a standard architectural project and therefore entitled him to the first installment payment provided by contract which purported to deal with such a standard development. At the same time respondent also submitted an initial Engineering and Economic Report as required of him by the contract. On October 1, 1957, the board ordered the adoption of the following recommendations:

"1. That your Board approve the attached schematic plans and specifications and Engineering and Economic Report for the Central Air Conditioning Compressor Plant at Los Angeles County General Hospital, as prepared by Architects Lunden, Hayward & O'Connor, 548 South Spring Street, Los Angeles - 13.

"2. That your Board instruct the County Engineer and the architects to determine the site for the proposed Plant and submit this information to the Board of Supervisors for approval.

"3. That the County Engineer be instructed to expedite preparation and submit to the Chief Administrative Officer the necessary resolution concerning the 'General Scope of the Project' as required by Article XV of the architectural services agreement.

"4. That said General Scope of the Project shall revise the tentative estimated cost of construction to be $2,128,931.

"5. That the Clerk of the Board be instructed to inform

the architects of the Board action, based on the recommendations herein."

On October 28, 1957, respondent was paid $10,000 which represented the first stage payment under the portion of the agreement relating to ordinary architectural services payable at the time of acceptance of schematic plans. It appears that no formal resolution was ever adopted to establish or determine the general scope of the project, although, as indicated, the schematic plans that were approved required an increase in the general scope to a tentative cost of $2,128,931. However, shortly after receiving his first payment, respondent undertook further general planning services at the request of appellant's county engineer and chief administrative officer, who represented it in connection with this project.[3]

All of these services, which unquestionably were of very substantial value to the county, were rendered at the request of its officers and apparently with all parties acting under the belief that the rendition of such services was part and parcel of respondent's duties under the hybrid and poorly adapted form of agreement. Over the next two and one-half years respondent rendered valuable services to appellant and supplied its officers with material designed to aid them and the board in determining which of several alternative projects ultimately should be accepted. The estimated costs of the alternative projects ranged between $4,000,000 and $10,-000,000.

No compensation was paid for these services during the period in which they were rendered because under the "standard" terms of the contract, no further payments were to be made until the next "architectural stage" was reached and this could not occur until after the general scope of the project was fixed and determined. It is impossible, however, to escape the conclusion that the parties, both by the inadequate language of their written agreement and by their actions taken thereunder, rather clearly indicated their under-

---

[3]Article V of the agreement between the parties provided as follows:

"The Chief Administrative Officer shall represent the County in all matters pertaining to the services to be rendered under this agreement until such time as the Schematic Plans have been approved by the Board. Subsequent to approval by the Board of the Schematic Plans, the County Engineer shall represent the County in all matters pertaining to the services to be rendered under this agreement. The Architect shall consult the Chief Administrative Officer on all matters in connnection with the work prior to approval of Schematic Plans, and the County Engineer thereafter."

standing and intention that respondent eventually would be compensated for these services.

That is to say, if the general scope of the project had been promptly established at $2,128,931 as the board had provisionally indicated was its intention on October 1, 1957, respondent presumably would have been able to proceed into the second stage provided for by the "standard terms" of the contract without the necessity of meeting the continuing demands of the city's officials for further exploratory advisory services over the next two and one-half years.

Further, if the general scope of the project later had been fixed between $4,000,000 and $10,000,000 as considered by the various plans which respondent was required to analyze and on which his extensive additional schematic material was submitted, the amended contract likewise presumably would have compensated him adequately for his services. Apparently these plans for the project were adversely affected and limited by reason of the defeat of a certain bond issue.

However, in any event, the issue here presented for the trial court's resolution only arose when, after having availed itself of respondent's services for two and one-half years after completion of the tentative "standard first stage" of the contract, appellant attempted to cancel it entirely. On this issue, Article IX of the contract expressly provided:

"The County may suspend or abandon the project in whole or in part, or may cancel the contract, without any liability *other than payment for the work already performed.*" (Italics added.)

Following this clear statement of basic intent, the "standard form" of the contract provided that if cancellation occurred at any of the times for payment set forth in the ordinary stages of performance, the respondent would receive such payment, and if the cancellation occurred between such stages, then respondent would receive an amount to be determined by negotiation between the parties but not to exceed the next succeeding scheduled payment.

Although, as heretofore discussed, these "standard stages" have little, if any, relevancy to the work demanded of and performed by, respondent herein, nevertheless appellant argues that since the Board of Supervisors never had ordered respondent to commence work on the second stage of the project, respondent was entitled to no further compensation for his services.

Such argument, of course, wholly ignores the fact that no

such order rationally could be made until the general scope of the project had been determined, and it was in aid of this later goal that respondent's services had been solicited and rendered.

We find the trial court's interpretation of this contract to the effect that both parties intended that compensation would be paid respondent for his services to be entirely proper and correct. Any contrary interpretation would be so anomalous as to amount to a violation of section 1638 of the Civil Code which provides: ''The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.'' That this *reasonable* intent, as found by the trial court, was the *actual* intent of the parties is made further manifest by their conduct both during the performance of respondent's services and following appellant's decision to cancel the agreement. As stated in *Bohman* v. *Berg*, 54 Cal.2d 787, 794-796 [8 Cal.Rptr. 441, 356 P.2d 185]:

''It is well-settled law that, although an agreement may be indefinite or uncertain in its inception, subsequent performance by the parties under the agreement will cure this defect and render it enforceable. When one party performs under the contract and the other party accepts his performance without objection it is assumed that this was the performance contemplated by the agreement. [Citations.]

''This rule is in accord with the cardinal rule of construction that when a contract is ambiguous or uncertain the practical construction placed upon it by the parties before any controversy arises as to its meaning affords one of the most reliable means of determining the intent of the parties. [Citation.] As was said in *Mitau* v. *Roddan*, 149 Cal. 1, 14 [84 P. 145, 6 L.R.A. N.S. 275]:

'' '. . . [I]n all cases where the terms of their contract, or the language they employ, raises a question of doubtful construction, and it appears that the parties themselves have practically interpreted their contract, the courts will follow that practical construction. It is to be assumed that parties to a contract best know what was meant by its terms, and are the least liable to be mistaken as to its intention; that each party is alert to his own interests, and to insistence on his rights, and that whatever is done by the parties contemporaneously with the execution of the contract is done under its terms as they understood and intended it should be. Parties are far less liable to have been mistaken as to the intention

of their contract during the period while harmonious and practical construction reflects that intention, than they are when subsequent differences have impelled them to resort to law. . . . The law . . . recognizes the practical construction of a contract as the best evidence of what was intended by its provisions.' [Citations.]''

As heretofore indicated, throughout respondent's performance in the instant case, it is unquestionably clear that all parties concerned believed that appellant's designated officers had the right under the contract to demand his continued rendition of services and that he had the corresponding duty to perform them. Even when the Board of Supervisors determined to cancel the contract, they requested that respondent and the county representatives negotiate and agree upon an appropriate sum to be paid respondent. The chief administrative officer and respondent agreed upon such a sum which the county engineer also agreed ''might approach'' a reasonable settlement. However, at this point an opinion of the county counsel stating that any payment would be illegal caused the Board of Supervisors to remove the recommendation of the chief administrative officer for payment from its July 12, 1960, agenda and, subsequently, to deny the claim respondent filed with it on similar advice of counsel. All of these actions and expressions on the part of the parties to the contract leave no room for doubt that the trial court's interpretation thereof was entirely reasonable and proper.

The only other assignment of error made by appellant that is not essentially included in and disposed of by the foregoing discussion is its assertion that the findings of fact made by the trial court were beyond the issues framed by the pleadings and the pretrial order. As nearly as we can comprehend the intended thrust of this assignment, it appears to be appellant's contention that the possibility that the contract was ambiguous and subject to interpretation was not considered by the parties so that the trial court's findings in relation thereto unfairly surprised appellant. We find no merit in this contention.

The joint pretrial statement expressly listed, *inter alia*, the following as ''Ultimate Issues of Fact Remaining in Dispute'':

''1. Whether defendant County of Los Angeles breached its contract with plaintiff by failing to pay to plaintiff the sums of money due him under the agreement in question. . . . (4) The damages, if any, sustained by the plaintiff as a result

of the alleged breach of contract. (5) The value, if any, of the services rendered for the County at the County's request. . . ."

The following were also listed among the "Ultimate Issues of Law Remaining in Dispute":

"1. Whether the agreement in question was breached by the refusal of the County of Los Angeles to pay the plaintiff any sums in addition to the $10,000.00 paid to the plaintiff pursuant to Subdivision a of Article IV of said agreement. 2. Whether the so-called 'extra services' and 'additional services' are in fact work required to be performed by the plaintiff pursuant to said agreement and whether said agreement provides the sole measure of compensation for the performance of such work. 3. Whether the County of Los Angeles is liable for 'additional services' performed at the request of certain of its officers or employees and whether said officers or employees were vested with the legal authority to bind the County for the payment of such services."

It would be difficult, indeed, to conceive of a more clear expression of an agreement by the litigants that it would be the task of the trial court to ascertain the true intent and purpose of the contract, which always is the objective of the process of interpretation. It necessarily includes the resolution of any ambiguities or uncertainties contained therein to the end that the court be placed in a position to determine whether a breach of the agreement has occurred and, if so, the measure of damages appropriate in the circumstances. Therefore, the following findings of fact made by the trial court not only are well supported by the evidence, but clearly included within the issues as framed:

"1. On March 28, 1956, the defendant and an architectural firm, consisting of plaintiff and plaintiff's assignors, entered into a written contract, prepared by the defendant, whereby the firm would render certain architectural services to defendant concerning a Central Air-Conditioning Plant at the Los Angeles County General Hospital.

"2. The contract was prepared by defendant. Printed form provisions set forth certain standard, usual duties of an architect rendering services to the County of Los Angeles, and the standard payment provisions upon cancellation.

"3. In addition to the usual form provisions for the standard architectural services, the contract required the architects to make a special comprehensive engineering survey and economic analysis with respect to the existing and all future requirements of the hospital.

"4. Pursuant to the requests of authorized representatives of the defendant, plaintiff rendered such special services to the defendant, until the defendant cancelled the contract in 1960. The reasonable value of such special services was $24,000.00 of which $3,750.00 heretofore has been paid by defendant to plaintiff.

"5. The terms of the contract were ambiguous regarding the scope and timing of such special services and, in the event of cancellation of the contract by the defendant, regarding payment for such special services. In the event of cancellation, however, the general intent of the parties was to compensate the architect for all services previously performed.

"6. The conduct of the parties has resulted in a practical construction of the contract that plaintiff is to be separately compensated for such special services upon and as a result of cancellation by the defendant.

"7. Defendant breached the contract by failing to pay plaintiff the full value of his such special services."

In addition to our holding that the proper interpretation of this contract was within the issues framed by the pleadings and the pretrial statement, it is unquestionable that this theory was expressly set forth in the brief filed by respondent prior to trial, the case itself was tried on this theory, and it was thoroughly briefed by both parties after completion of the introduction of evidence. Certainly no reasonable argument could be made that appellant was surprised, misled or prevented from making an adequate presentation of its case in this instance. (Cf. *Rocky Mountain Export Co.* v. *Colquitt,* 179 Cal.App.2d 204, 206-207 [3 Cal.Rptr. 512]; *Garrett* v. *William A. Cochrane Co.,* 189 Cal.App.2d 566, 574 [11 Cal. Rptr. 345].)

Even if it could be rationally argued that appellant was surprised herein, it offered no indication in support of its motion for a new trial what evidence it reasonably expected to produce which might have supported a finding by the court that it had been the intention of the parties to the agreement that respondent was to render services thereunder for two and one-half years without receiving any compensation therefor.

We feel it appropriate to mention that, although it is never expressly stated, we gain the impression that the actions of appellant and its counsel in the instant case were motivated by the latter's commendable desire to halt the practice, so fraught with dangerous potential, of entering into "nebulous" contracts which it was understood would immediately be sub-

ject to "upward" modification. However, there is no indication whatsoever that any such dangerous potentials were either contemplated or realized in the instant case, nor is there the slightest suggestion that the actions or motives of any agent or party to this transaction were otherwise than sincere and honest.

The judgment is affirmed.

Roth, P. J., and Fleming, J., concurred.

A petition for a rehearing was denied May 20, 1965, and appellant's petition for a hearing by the Supreme Court was denied June 23, 1965.