[Civ. No. 24711.   First Dist., Div. One.   Apr. 15, 1968.]

DALE E. CRAWFORD, Plaintiff, Cross-defendant and Respondent, v. CONTINENTAL CASUALTY COMPANY, Defendant, Cross-complainant and Appellant.

Spurr, Brunner & Nelson and W. H. Brunner for Defendant, Cross-complainant and Appellant.

Leo M. Cook for Plaintiff, Cross-defendant and Respondent.

ELKINGTON, J.—Continental Casualty Company, defendant below, appeals from a judgment declaring that the "annual" premium of one of its insurance policies was $18.50. Continental by a cross-complaint had sought reformation of the policy, contending that the word "annual" was inserted in the policy instead of the word "quarterly" through a mistake which was mutual, or was known or suspected by the policyholder, plaintiff Dale E. Crawford.

The policy was an "Income Protection Policy" paying regular monthly indemnity of $100 for loss of time through injury or sickness. It was described as a policy that will provide benefits for anyone gainfully employed in the event that due to sickness or accident he is unable to carry on his employment. When the insured reaches his sixtieth year the income protection benefits of the policy are reduced 50 percent. The policy provided additional benefits for dismember-

ment or loss of life through accident. It could be cancelled by either party at the end of any premium period. The portion of the policy here under consideration states:

"The first premium for this policy is $ *28.50* payable in advance and its *annual* renewal premium is $ *18.50* .

"The policy is dated and takes effect on the *9th* day of *December, 1947* and continues in effect until the first day of *April, 1948* ; it may be renewed with the consent of the Company for further consecutive *annual* periods by the payment in advance of renewal premiums. . . .

"After the first year's premium has been paid, each annual renewal premium paid in advance on this policy shall add ten percent to the amount payable for loss of life, but the total of all such increases shall in no event exceed 100%." The words and figures in italics are typewritten; the remainder of the policy is a printed form.

On plaintiff's written application for the policy, among other things, appears the following: "What is the premium? $ *96.00* 1st payment $ *74.00* ~~quarterly~~ thereafter."
     *28.50*                    *18.50*     annually .

The figures here in italics were handwritten while the remainder was part of a printed form. The figures $*96.00* and $*74.00* and the line through the word "quarterly" were drawn with ink of one color, while the figures $*28.50* and $*18.50* and the lines through the figures $*96.00* and $*74.00* were drawn with ink of a different color.

The annual premium rate filed with the California Insurance Commissioner for the type of policy here involved was $74 per year.

Commencing January 1, 1948, to and including July 1, 1965, plaintiff paid to Continental an $18.50 premium every three months. In September of 1965, as permitted by the policy, Continental notified plaintiff that the policy's quarterly premium had been increased to $23.13. Plaintiff, upset about the increased premium rate, went to his safe deposit box, removed the policy and looked at it, apparently to see if Continental was acting within its rights. He thereafter notified Continental: "Please check your records and Policy 163805. My accounts show this policy paid in advance for 51 years."

The increased premium claimed due by Continental was not paid and the company declared the policy to be lapsed. The instant action for declaratory relief resulted.

Plaintiff, at the time the policy was written, was 25 years old and employed as a lumber mill superintendent. His company had an employee retirement plan. At the time of the trial plaintiff was required to retire from his employment at age 65. He testified to the following. He and the Continental agent had reached agreement on a policy at a certain figure. He didn't feel he could afford a larger policy. When the filled-out application was presented to plaintiff he said the figures "96" and "74" were not the figures agreed upon. The agent thereupon checked some references, struck out the figures "96" and "74" and the word "quarterly" and inserted the figures "28.50" and "18.50." At the time the agent explained that if 10 annual premiums were paid at an accelerated rate the accidental death benefit of the policy would be doubled. Further, by prepaying the policy, plaintiff could stop premium payments when his income dropped and he became older. Plaintiff then made arrangements with the agent to pay an annual premium each quarter. Such annual premiums were thereafter paid each quarter until 1965.

Accepting the testimony of plaintiff would require one to believe that his intent was to prepay the premiums of his "Income Protection Policy" to the year *2016* when he would be 94 years of age and would have been retired from his employment for 29 years. Moreover, one must necessarily believe that although plaintiff felt he could not afford a larger premium than $18.50 per year, he nonetheless thereupon started paying unrequired premiums of four times that amount.

Continental contends that the application shows on its face, as originally filled in, that the premium payments were "$96.00 first payment, $74.00 annually thereafter"; that a decision was thereafter reached for quarterly instead of annual payments; that the designated payments were accordingly changed but through inadvertence the parties neglected to restore the stricken word "quarterly" and to strike out the word "annually." The company further contends that the typist who customarily follows the application mistakenly typed the words "annual" on the policy. It is insisted that plaintiff understood the premium to be $18.50 for each quarter year, that he treated the policy as calling for quarterly premiums for almost 18 years and that his first contention of 51 prepaid "annual" premiums was made in 1965 when he discovered the company's mistake.

Continental's agent, who sold the policy to plaintiff, was dead, or at least was unavailable for the trial.

We are, of course, bound by the rule that a finding of the trial court will not be disturbed on appeal if there is evidence of a substantial character which reasonably supports the judgment. (*Fewel & Dawes, Inc.* v. *Pratt,* 17 Cal.2d 85, 89 [109 P.2d 650]; *Crawford* v. *Southern Pac. Co.,* 3 Cal.2d 427, 429 [45 P.2d 183].) Apart from a consideration of the documents at issue, the only evidence here tending to support the judgment is the testimony of plaintiff.

In *Fewel & Dawes, Inc.* v. *Pratt, supra,* 17 Cal.2d 85, 89, our Supreme Court stated: "If, however, the evidence is so slight and tenuous that it does not create a real and substantial conflict the finding may be set aside. . . . 'There must be more than a conflict of words to constitute a conflict of evidence. The contrary evidence must be of a substantial character, such as reasonably supports the judgment. . . .' "

In *Hicks* v. *Reis,* 21 Cal.2d 654, 660 [134 P.2d 788], the same court quoted with approval language of *Market Street Ry. Co.* v. *George,* 116 Cal.App. 572, 576 [3 P.2d 41], declaring, " 'It has always been the rule that courts and juries are not bound by mere swearing no matter how positive, unless it be credible swearing. . . .' "

*Estate of Teed,* 112 Cal.App.2d 638, 644 [247 P.2d 54], dealing with the substantial evidence rule, held that "if the word 'substantial' means anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with 'any' evidence. It must be reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case." (See also *Brautigam* v. *Brooks,* 227 Cal.App.2d 547, 557 [38 Cal. Rptr. 784]; *Estate of Bishop,* 209 Cal.App.2d 48, 53 [25 Cal. Rptr. 763].)

It is well settled that although an agreement may be indefinite or uncertain in its inception, the subsequent performance of the parties will be considered in determining its meaning for they are least likely to be mistaken as to the intent. (*Bohman* v. *Berg,* 54 Cal.2d 787, 795 [8 Cal.Rptr. 441, 356 P.2d 185]; 1 Witkin, Summary of Cal. Law (7th ed. 1960) Contracts, § 221, pp. 249-250.) In *Crestview Cemetery Assn.* v. *Dieden,* 54 Cal.2d 744, 754 [8 Cal.Rptr. 427, 356 P.2d 171], the court said: "This rule of practical construction is

predicated on the common sense concept that 'actions speak louder than words.' " California Jurisprudence 2d, volume 12, Contracts, page 342, summarizes the sound reasons behind the rule with this statement: "The parties are less liable to have been mistaken as to the intention of their contract during the period while harmonious and practical construction reflected that intention than they are when subsequent differences have impelled them to resort to law and one of them seeks a construction at variance with the practical construction they once placed on it."

We now look to certain undisputed evidence including the conduct of plaintiff to determine if his testimony creates a real and substantial conflict and if, as required by *Estate of Teed, supra,* 112 Cal.App.2d 638, 644, it is *"reasonable in nature, credible, and of solid value. . . ."* (Italics added.)

It appears that prior to each of 70 quarterly periods, from April 1, 1948 to October 1, 1965, plaintiff received a "Renewal Premium Notice." The notice stated: "Now is the time to keep your accident—sickness or hospitalization policy in good standing. Payment should be made on or before the date shown below." Below was stated (as taken from a typical notice) the following:

| Amount Due | Due Date | | |
|---|---|---|---|
| | mo. | day | yr. |
| $18.50 | 10 | 01 | 63 |

Twice, in 1957, and in 1958, plaintiff did not pay his premium within the required time. Each time, in accordance with company practice, a "Notice of Lapse" was sent to him. After each such notice was sent, he paid the delinquent premium, whereupon he was sent a "Notice of Reinstatement" of the policy.[1]

The application indicates, from the difference in ink colors[2] that as originally filled out it read "*$96.00* 1st payment ~~quarterly~~ *$74.00* annually thereafter" as contended by Continental This is in sharp conflict with plaintiff's testimony that when he called attention to the wrong figures the agent drew lines through them *and through the word "quarterly."* If plaintiff's story was correct then both the figure changes and the

---

[1]Plaintiff testified he had no recollection of these lapses and the following reinstatements.

[2]Plaintiff admitted that the difference in ink colors was apparent.

crossing out of "quarterly" would have been one continuous act with the same pen and ink; however, as indicated such is not the case.

The policy on its face shows that the first premium which plaintiff insists was for a year, was in fact for the first quarter of the policy.

Explaining why he wanted to prepay the premiums plaintiff stated that he thus increased the accidental death benefits. Under the policy's provisions, admittedly known by plaintiff, such benefits would reach their maximum after 10 annual payments, which according to plaintiff were made in the policy's first two and one-half years. An additional explanation was that after he retired he would have the benefit of the policy without being required to pay further premiums, yet he knew that the principal benefit of the policy, its "income protection," was available only while he was employed.

From a consideration of the foregoing we conclude that the evidence indicates the parties intended the stated premiums to be on a quarterly basis; that through mutual mistake of the parties the word "annual" appeared on the application and policy; and that there is no *substantial* evidence to the contrary which reasonably supports the trial court's findings and judgment.

The judgment is reversed; the superior court will make findings and enter judgment for defendant on its cross-complaint.

Molinari, P. J., and Sims, J., concurred.