# CASPER NATIONAL BANK v. CURRY

(No. 1999; March 9, 1937; 65 Pac. (2d) 1116)

For the plaintiff in error the cause was submitted on the briefs of *Marvin L. Bishop, Jr.* and *Hagens & Wehrli* of Casper.

For the defendant in error, the cause was submitted on the brief of *R. H. Nichols* and *S. J. Lewis* of Casper.

RINER, Justice.

The defendant in error, Guy R. Curry, who will here-inafter at times be referred to as the "plaintiff," brought an action in the district court of Natrona County, against John Murdoch, as defendant, to recover past due rent on certain lands leased by the former to the latter, and also for services asserted to have been performed by him for Murdoch under an alleged oral agreement made between these two men. After the action was commenced Murdoch died and the Casper National Bank being in due course appointed as administrator of his estate, the proceeding was revived against it. Questions raised by its defense to plaintiff's claims and argued here through the briefs filed, will be subsequently detailed and considered. The trial of the action was to the court without a jury, and resulted in a judgment for the plaintiff, with which the administrator was dissatisfied, asserting it to be erroneous in certain particulars.

The facts appearing in the record relative to the

plaintiff's claim for past due rent are not in dispute, and, summarized, appear to be: On September 11, 1929, Curry leased to Murdoch 1161 acres of land situated in Converse County, Wyoming, for the term extending from September 11, 1929, to December 31, 1932. The lessee agreed to pay rent as follows: October 15, 1929, $200.00; July 1, 1930, $200.00; October 15, 1930, $200.00; July 1, 1931, $200.00; October 15, 1931, $200.00; and July 1, 1932, $200.00. The first instalment of rent was paid by Murdoch, but not the others. In the spring of 1932, Curry asked Murdoch if he were "going up there that summer"—i. e., if he were going to use the leased lands the coming summer—and Murdoch told him, "No, he wasn't." Thereupon, under date of April 30, 1932, Curry, without saying anything more to Murdoch on the subject, leased the property originally let to the latter, together with some 1920 additional acres of land, a part of which was located in Natrona County, Wyoming, to one Guy E. Barker, for a period commencing April 20, 1932, and ending April 19, 1933, for a lump sum rental off $262.50, of which the amount of $122.50 was paid the date the lease was made and the balance, or $140.00 was required to be forthcoming on or before July 1, 1932.

The administrator, in its answer, admitted an allegation in plaintiff's amended petition to the effect that on account of Murdoch's failure to pay the rental instalments, as above indicated, Curry leased the premises covered by the original agreement of lease to a third party for the balance of the year 1932, for the sum of $150.00. This answer pleaded also that Murdoch surrendered the lease given him by Curry and that this surrender was accepted by the latter.

The court rendered judgment in favor of the plaintiff on his claim for rent due, in the amount of $850.00, with interest on the several instalments from the dates they accrued. The last rental instalment of $200.00,

due July 1, 1932, was, it will be noted, reduced to $50.00, on account of, as it would seem, the admitted fact that plaintiff received $150.00 for the re-letting of the land, the court evidently adopting the view that there had been no surrender of the premises, which had been accepted by the plaintiff. This disposition of the matter is criticized by the administrator, and it is said that the undisputed evidence in the case establishes that Murdoch in the spring of 1932 surrendered the lease he held and that his surrender thereof was accepted by Curry. It is certainly true that if this contention be based upon fact, then the rights and liabilities of the lessor and lessee are somewhat in general terms as indicated by the language of this court in Marshall v. Rugg, 6 Wyo. 270, 44 Pac. 700, 45 Pac. 486, where it was said: "The surrender of the lease terminated the relation of landlord and tenant between the parties. It did not terminate the relation of debtor and creditor on account of liabilities already incurred at the time the agreed surrender of the lease was carried into effect by the delivery of possession of the premises."

The evidence in the case does not disclose any agreement between Curry and Murdoch relating to the surrender of these leased premises. Accordingly we are not concerned with an express surrender, sometimes designated a surrender "in fact" or "in deed," which can be accomplished by an appropriately worded instrument manifesting an intention on the part of him who executes it to transfer the leasehold interest to the reversioner. What is presented in the case at bar is, it is clear, that type of surrender of the reversionary interest which is referred to in the authorities as a surrender by operation of law. This results from the effect given by the courts to the acts and conduct of the parties under certain circumstances which create factual situations inconsistent with the continuing operation of the lease. The principles of the law of

estoppel, somewhat modified to meet the circumstances of the matter, appear to be the underlying support for the doctrine. 2 Tiffany Landlord and Tenant, 1322-3; Felker v. Richardson, 67 N. H. 509, 32 Atl. 830.

Surrender by operation of law may result from varying states of facts. When the evidence in a case discloses that a tenant has abandoned the leased premises and the landlord has relet to another, the question at once arises, does this present such a situation as will invoke the doctrine of surrender by operation of law? A survey of the authorities indicates that they are not at all in accord in their rulings concerning cases of this kind, and the intention of the landlord to accept the tenant's surrender of the premises plays an important part in the matter. See inclusive notes in 3 A. L. R. 1080, 52 A. L. R. 154, and 61 A. L. R. 733.

Without undertaking to analyze or differentiate these discordant decisions, it seems to us that so far as the matter at bar is concerned, the general rule stated in 35 C. J. 1093-4, which appears to be based satisfactorily upon an extended citation of cases from very many jurisdictions, is sound and consonant with both justice and reason. The text says:

"An unqualified taking of possession by the lessor and reletting of the premises by him if done pursuant to the tenant's surrender constitute an acceptance of the surrender and releases the tenant, and where nothing is said as to the reletting, and the original lessee is not notified and does not consent, and there is no provision in the lease in regard thereto, the general rule is that the reletting shows an acceptance of the surrender, although the contrary rule seems to prevail in some states, and the tenant is not thereby released from liability upon the lease."

In 2 Tiffany's Landlord and Tenant, 1340, Sec. 190, the author very logically reasons:

"The act of the landlord in undertaking to lease to another, without the former tenant's consent, is nec-

essarily an assumption of absolute control of the premises, excluding any rights of possession in the other. The landlord, by giving the second lease, in effect asserts that he alone is entitled to control the possession of the premises. Furthermore, looking at the matter from a somewhat different standpoint, it is necessary, if the second lease, given without the tenant's consent, is to be regarded as valid to confer present rights of possession, that the operation of the former lease shall have come to an end, since two distinct persons cannot each be entitled to the exclusive possession of the same premises. As has been remarked in this connection 'if the former tenant brings ejectment against the new tenant, what defense can the new tenant have,—except that plaintiff's right has ceased?' In what has been said above it is assumed that the reletting is without the consent of the former tenant."

See also II Underhill on Landlord and Tenant, § 713, p. 1213. It is not necessary to decide on this record whether a surrender of the premises by operation of law occurs when the landlord, upon learning of the abandonment of the premises by the tenant, notifies the latter that he will not accept their surrender, but will relet them for the account of the tenant and will look to him to make good any loss resulting. Such facts are not presented by the case in hand.

In Michigan LaFayette Bldg. Co. v. Continental Bank, 261 Mich. 256, 246 N. W. 53, the court remarked that: "Ordinarily, the execution of a new lease extending beyond the period of the abandoning lessee's term would indicate acceptance of surrender of his lease."

The Supreme Court of Pennsylvania in Rafferty v. Klein, 256 Pa. 481, 100 Atl. 949, has said:

"If, as averred, plaintiff took possession of the demised premises and without notice to the principal or surety made a lease thereof to a new tenant, for a term of years extending far beyond the expiration of the original term, thus blending the unexpired term in the general lease, even at a less rate per month, he cannot

in our opinion recover from the original lessee for loss of rent resulting subsequent to the beginning of the new term, which seems to have been April 1, 1913."

A similar view was announced in Welcome v. Hess, 90 Cal. 507, 27 Pac. 369, where this language was used:

"In taking possession, the landlord did not announce his intention to continue to hold the tenants. He relet without notifying the defendants that he should do so on their account. He relet for a period longer than the remainder of their term, thus showing plainly that he was acting in his own right, and not as their self-constituted agent. Under such circumstances, he cannot say that he did not accept the surrender."

To the same effect are the cases of Hewitt v. Adair, 102 Fla. 5, 135 So. 560; In re Goldburg's Estate, 266 N. Y. S. 106; In re Adams' Estate, 267 N. Y. S. 910; State Guaranty Corporation v. Richardson, 9 Cal. App. (2d) 287, 49 Pac. (2d) 606.

It would seem quite clear, when the facts relating to the abandonment and reletting of the premises originally leased to Murdoch are viewed in the light of the rule announced by Corpus Juris, cited above, that when Murdoch unqualifiedly told Curry he was not going to use the land the coming summer and the latter, without intimating either by word or act, that he intended to hold Murdoch for the difference between the rentals, and without Murdoch's acquiescence in any such procedure, nevertheless leased all this property to Barker, a surrender of the premises by operation of law was accomplished.

The intention of Curry to accept the surrender of the premises tendered by Murdoch and to use them for his own account is additionally apparent, under the decisions last above reviewed, when it is recalled that Curry united the lands covered by the Murdoch lease with other lands he owned in another county, and leased all of them for a term longer than that provided for in

the original lease to Murdoch. Additionally there seems to have been no attempt on Curry's part to indicate in the subsequent lease the amount of rent he should receive from Barker for the lands originally leased to Murdoch. Only a lump sum in rental money was required for all the lands demised to the last lessee, although, if Curry had had in mind the idea of holding Murdoch on his covenant to pay rent, it is plain that a separation of the rental amounts for the two groups of lands could, and doubtless would, have been made.

We think, therefore, that on the claim of the plaintiff for unpaid rentals, the judgment of the trial court should be modified by disallowing a recovery of the sum of $50.00 and interest thereon, arising in consequence of Murdoch's failure to pay the rental instalment due July 1, 1932. As we have seen, he was under no obligation to meet it, the legal surrender of the property to Curry having theretofore been an accomplished fact.

Relative to plaintiff's claim for services rendered Murdoch by Curry, the facts presented by the evidence in the case are not extensive. According to plaintiff's witness Bennett, Murdoch and Curry had a conversation at his home in Casper sometime in January, 1930, the exact date the witness could not remember. After relating that Curry was then working "out at the refinery," the witness stated: "I remember, they were talking about wages, and kind of figuring, and I wasn't paying so awful much attention because I wasn't so much interested, except I know he said something about $85.00 a month, and they was a figuring that that would be practically what he was making out there after he paid me board." He then additionally testified on this matter, through questions and answers:

"Q. What did Mr. Murdoch say with reference to salary he was willing to pay Mr. Curry?

A. $85.00 a month, is the way I understood it.

Q. Did Mr. Curry agree with Mr. Murdoch on that wage?

A. Yes.

Q. Was there anything said as to when Mr. Curry was to enter that employment?

A. Along about the first of May, 1930."

On cross-examination, in response to inquiries as to how long Curry's employment was to last and what he was to do, the same witness answered that Murdoch "said there would be work around the ranch and stuff to do to keep him busy when he was not herding sheep or lambing," and that the way the witness understood it, it was to be a permanent job. Curry himself testified that he worked for Murdock from May 7, 1930, until December 7, 1931, and that he was absent from his work during that period 59½ days. His testimony and that of other witnesses for the plaintiff disclosed that he was engaged in looking after the sheep on the ranch, of which there were about 3400, and doing general ranch work when not employed in working with the sheep.

The plaintiff's pleading alleged in substance that on or about January 25, 1930, he and Murdoch entered into an oral agreement, whereby he was employed by the latter as sheepherder and general ranchhand, on a month to month basis, beginning May 7, 1930, for which Murdoch agreed to pay him $85.00 per month; that he began this work on the date last mentioned, and continued in the stated employment for seventeen months, and that he had not been paid therefor. The defendant's answer thereto was in effect that no such agreement was made between the parties, and that plaintiff had been fully paid for the work he did.

The defendant introduced no evidence at all in the case except that of Guy Barker, who testified only concerning the lease above mentioned, as given to him by

Curry after Murdoch had said he would not use the lands leased by Curry to him.

The court gave judgment on the plaintiff's claim for services, in the amount alleged by him to be due, with interest thereon.

The contention advanced on behalf of the administrator against plaintiff's claim in this respect is that the foregoing evidence is too indefinite, uncertain and incomplete to establish the express contract upon which the plaintiff's action was based. It concedes that a recovery might be had upon a quantum meruit, but in that way only. It says that the alleged contract does not specify any fixed term of employment, does not define the nature of the work to be done, nor the rate of compensation that was to be paid for the term. Our attention is also directed to decisions declaring that claims presented against estates of deceased persons should be scrutinized by the courts with extreme care and not allowed except upon clear evidence to support them.

The solution of the question whether the agreement proven was really so indefinite as to preclude a recovery under the facts presented will be aided by an examination of the following authorities.

In the case of Watson v. Gugino, 204 N. Y. 535, 98 N. E. 18, it was held that as a contract of employment, wherein no period of service is specified, is terminable at the will of either party, where a person contracted to devote his whole time and attention to the business of a corporation, at a specified weekly wage, such contract could be concluded at any time at the option of either of the parties, and the Court of Appeals said:

"In this state the rule is settled that unless a definite period of service is specified in the contract, the hiring is at will and the master has the right to discharge and the servant to leave at any time. In Martin v. New York L. Ins. Co., 148 N. Y. 117, 42 N. E. 416, the

defendant employed the plaintiff to take charge of its real estate department at a salary of $5,000 a year. Subsequently his salary was raised to $6,500 and finally to $10,000 a year, payable monthly. We held that the hiring was at will and that the contract could be terminated at any time by either party. Judge Bartlett, speaking for the court, adopted the language used by Mr. Wood in section 136 of his work on Master and Servant, as follows: 'The rule is inflexible, that a general or indefinite hiring is prima facie a hiring at will; and if the servant seeks to make it out a yearly hiring, the burden is upon him to establish it by proof. A hiring at so much a day, week, month or year, no time being specified, is an indefinite hiring, and no presumption attaches that it was for a day even, but only at the rate fixed for whatever time the party may serve.' "

A similar rule was stated in The J. P. Schuh, 223 Fed. 455, in this language:

"A hiring at so much a day, week, or month, no time being specified, is an indefinite hiring, and no presumption attaches that it was for a day even, but only at a fixed rate for whatever time the party may serve. Unless the understanding of the parties was mutual that the service was to extend for a certain fixed and definite period, it is an indefinite hiring, and is determinable at the will of either party; and a recovery may be had for the services actually rendered."

See also I Williston on Contracts (Rev. Ed.) Sec. 39, pages 106-7.

The author of the text last above cited says (Sec. 38, page 104):

"In many cases, however, a promise which contemplates continuing performance for an indefinite time has been interpreted as stipulating only for performance terminable at the will of either party. Thus an agreement to lease, without limitation of time, imposes no obligation. Though such agreements while wholly executory create no obligation, if either party performs, he will be entitled to compensation according to the terms of the agreement."

In Bentley v. Smith, 3 Ga. App. 242, 59 S. E. 720, it appeared that plaintiff had entered the defendants' employ in response to a telegram, which read:

"Frank Bentley,
Woodville, Ga.
Dry Goods position open. $50 per month until January. Permanent position. Can you accept at once?
O. & H. Smith"

It was held that this was a contract to continue indefinitely, and so to be terminable at any time by either of the parties, and gave the defendants the right to discharge the plaintiff whenever they saw fit. See also I Williston on Contracts, (Rev. Ed.) Sec. 39, page 110

Discussing the effect of part performance upon indefinite promises, and citing elaborately the cases, Mr. Williston in his work aforesaid indicates the conclusion to be drawn therefrom thus (Sec. 49, page 139) : "If, however, the side of the agreement which was originally too vague for enforcement becomes definite by entire or partial performance, the other side of the agreement (or a divisible part thereof, corresponding to the performance received), though originally unenforceable, becomes binding."

And he further remarks on the same subject (§ 106, pp. 366-7) : "But a promise that was originally too indefinite, may by performance become definite and as the other party to the bargain must be regarded as continuously assenting to receive such performance in return for his own promise, a valid unilateral contract arises on receipt of such performance."

The court in Foley v. Western N. Y. & P. R. Co., 19 N. Y. S. 826, announces its view, which is altogether in accord with the foregoing authorities, in these words:

"The plaintiff was employed for no definite period. He could have left the employment of the defendant without notice. He could have been discharged by it at pleasure. And when either party elects to terminate

a contract for labor, indefinite as to the time, it becomes a completed contract. McLees v. Hall, 10 Wend. 426. And after a contract has been fully executed it cannot be repudiated by the party who has reaped the benefit of it."

See also Griffin v. Domas, 22 Ill. App. 203.

In the instant case, there is substantial evidence that Curry performed services as an employee on Murdoch's ranch, doing general ranch work and looking after the sheep owned by Murdoch, for the period of time for which the plaintiff claims remuneration. There is likewise testimony, which the court was authorized to accept as true, which fixed the compensation for such services as agreed upon by the parties. Any indefiniteness in the contract concerning the time the services were to be rendered, their character, etc., would seem to have been removed by performance on Curry's part and the acceptance thereof by Murdoch. Under a finding in his favor, Curry was consequently entitled to recover the amount for which he brought his action on account of services rendered as upon an express contract. The trial court, having seen, heard and given credence to the witnesses who testified for the plaintiff on this matter, there is no controlling legal principle to which our attention has been directed which authorizes us to interfere with the judgment below relating to this branch of the case.

We are in accord with the authorities which announce the rule that claims against the estates of deceased persons should be scrutinized with care and not permitted to prevail except upon clear proof. But we cannot say upon the record before us that the trial court by its judgment has acted in disregard of such a rule. It may perhaps be that the rate of remuneration testified as agreed upon between Murdoch and Curry was considerably higher than that ordinarily paid to ranch employees engaged in similar work. There may

have been reasons to account for that which do not appear in this record. At any rate, it is hardly necessary to remark that courts cannot make or remake contracts for parties.

The judgment of the district court disposing of the issues relating to plaintiff's claim for services will therefore be affirmed.

*Modified and Affirmed.*

BLUME, Ch. J., and KIMBALL, J., concur.