DEVELOPMENT ENTERPRISES, INC., a
Wyoming corporation, Appellant
(Plaintiff below),

v.

William F. MIYAMOTO and Tom Miyamoto,
Appellees (Defendants below).

No. 3765.

Supreme Court of Wyoming.

Nov. 26, 1969.

John F. Lynch, of Kline, Tilker & Lynch, Cheyenne, for appellant.

Ellen Crowley, Tosh Suyematsu, and Bernard E. Cole, Cheyenne, for appellees.

Before GRAY, C. J., and McINTYRE, PARKER, and McEWAN, JJ.

Mr. Justice McINTYRE delivered the opinion of the court.

Development Enterprises, Inc., has appealed from that part of a judgment entered by the District Court of Laramie County which denied it a money judgment for unpaid rent.

The plaintiff, Development Enterprises, as owner and lessor, entered into a ten-year lease with defendants, William F. Miyamoto and Tom Miyamoto, who were the tenants and lessees. The property leased was a new building constructed by Development Enterprises for occupancy by lessees. The lessees operated a bowling alley business in the building.

The lease provided for an annual rental of $19,500 payable at $1,625 per month. Pursuant to terms of the lease, lessees deposited $11,375 with the lessor as a payment of the monthly rental for the last seven months of the ten-year lease. It was provided, in the event the tenants default in payment of the rental payments, then owner may use said sum for reimbursement of damage for failure to pay said rental.

The bowling alley business in the leased building was not a success, and within three years lessees were falling behind in their rent and in fact had ceased making payments at all. Finally, on November

10, 1964, the lessor obtained a writ of restitution as a result of a forcible entry and detainer action in a justice of the peace court. The tenants claim, and apparently it is not disputed, that the deposit of $11,375 was sufficient to cover all rentals due through the rest of November, 1964, or some 20 days beyond the time when lessor resumed possession of the premises.

The judgment of the trial court appears to be based on a finding that the plaintiff terminated its lease when defendants vacated the property. On appeal, appellant assigns as error that re-entry and taking of possession did not terminate the lease; and that the court erred in finding generally for the defendants on plaintiff's complaint.

Other points argued to us by both appellant and appellees relate to additional defenses which the defendants argued below and still argue on appeal. These defenses question whether the defendants were induced by plaintiff's fraudulent representations to execute the lease; whether the decision of a justice of the peace in a forcible entry and detainer action became *res judicata*; whether the plaintiff was guilty of laches; and whether plaintiff breached its agreement in the lease relating to construction of a parking area and maintenance of the premises.

Inasmuch as defendants have not appealed, there would be no reason on appeal to consider matters which we have listed as having to do with additional defenses, unless it is first determined that the district court erred in finding that plaintiff terminated the lease; or that the trial court erred in finding generally for the defendants on plaintiff's complaint.

### Taking of Possession by Landlord

Counsel for plaintiff-landlord recognizes the rule stated in Casper National Bank v. Curry, 51 Wyo. 284, 65 P.2d 1116, 1118, 110 A.L.R. 360, to the effect that an unqualified taking of possession by a lessor and reletting of the premises, if done pursuant to the tenant's surrender, constitute an acceptance of the surrender and releases the tenant, *where there is no provision in the lease in regard thereto.*

It is the position of such counsel, however, that the lease in this case contains a provision which controls. The pertinent language of the provision relied on by appellant's counsel is this:

"Should Owner elect to re-enter * * * or should it take possession pursuant to legal proceedings * * * it may either terminate this lease or it may from time to time without terminating this lease * * * relet said premises or any part thereof for such term or terms * * * as Owner in its sole discretion may deem advisable * * *."

It is essential that we pause at this point to note the provision just quoted gives the landlord an alternative. Such landlord may either (1) terminate the lease, or (2) without terminating the lease it may "relet" the premises.

Very clearly then it became a question of fact in this case for the trier of fact to determine which the landlord did—whether it terminated the lease, or whether it relet the premises without terminating the lease. Our review of the testimony and record convinces us there was substantial evidence from which the trial court could conclude, as it apparently did conclude, that plaintiff elected to and did in fact terminate the lease when it took possession.

In arriving at this conclusion, we are aware that the lease specifies no re-entry or taking of possession by the owner shall be construed as an election on the owner's part to terminate the lease, unless a written notice of such intention is given to the tenant. There is no evidence of such a written notice, and therefore the trial court was not entitled to infer that plaintiff had elected to terminate the lease merely from the fact that plaintiff had dispossessed defendants.

This does not, however, foreclose the possibility of the court inferring an elec-

tion on the owner's part to terminate the lease from entirely different acts, statements and omissions indulged in by the owner.

Appellant relies on Yates v. Reid, 36 Cal. 2d 383, 224 P.2d 8, 9, as authority for its argument. The opinion in that case will serve to point up the distinction we seek to make.

In *Yates* the court said the retaking of possession by the plaintiff as landlord and his reletting of the premises were entirely consistent with the rights of the tenant under the lease. We adopt the same statement for the case we are dealing with. In our case likewise, the retaking of possession and reletting of the premises (if they were relet) would be consistent with the terms of the lease and would not denote a termination.

At this point we have a difference, however. In *Yates* the court was able to say the plaintiff "did no more" than exercise the rights accorded to him; and therefore his conduct did not result in a surrender of the lease by operation of law.

In the case we are concerned with, Development Enterprises "did more" than exercise those rights accorded to it in the event of an election to keep its lease alive. Hence, there needed to be a determination by the trial court whether, in addition to its re-entry and taking of possession, the owner expressly agreed (orally or in writing) to terminate its lease; or whether the owner's agreement to terminate the lease was to be implied from acts and circumstances of the parties separate and independent of the act of re-entry and taking of possession.

■ An agreement to terminate a lease need not be express but may be implied from the conduct and language of the parties and it is not necessary that such agreement be evidenced by a writing signed by the parties. Barber v. Smythe, 59 Wyo. 468, 143 P.2d 565, 568; Rodgers v. Saunders, 144 Mont. 424, 396 P.2d 817, 818; Gordon v Consolidated Sun Ray, Inc., 195

Kan. 341, 404 P.2d 949, 953; Phillips v. Maxey, 195 Okl. 418, 158 P.2d 344, 345.

It was stated in Belanger v. Rice, 2 Utah 2d 250, 272 P.2d 173, 174, a surrender of a lease by operation of law results from acts which imply mutual consent "independent of the expressed intention of the parties." Such result was said to be by way of estoppel.

■ Whether in any given case there has been a termination of lease by mutual agreement, express or implied, is primarily a question of fact to be determined by the trial court from the whole transaction. Wiese v. Steinauer, 201 Cal.App.2d 651, 656, 20 Cal.Rptr. 295; Rognier v. Harnett, 45 Cal.App.2d 570, 114 P.2d 654, 656; Phillips v. Maxey, 195 Okl. 418, 158 P.2d 344, 345.

Concerning the question of whether there was an agreement, express or implied, between Development Enterprises and the Miyamotos for termination of their lease, we will review some of those things reflected in the evidence which could have persuaded the trial court that plaintiff elected to and did in fact terminate its lease. In making this review, we shall be very careful to see that no reliance is made on the fact that the owner re-entered and took possession of the premises—that, it had a right to do in order to preserve the property and mitigate damages.

### Evidence of Election

■ *First.* According to the provisions of the lease which we have previously quoted, the alternatives which the owner had upon re-entering or taking possession of the premises were either to terminate the lease or to "relet" the premises without terminating the lease. As far as the written lease is concerned, owner did not have the privilege of occupying and using the premises itself without terminating the lease.

Robert Buenger, vice president of Development Enterprises, testified for plaintiff at the trial. On direct examination,

plaintiff's attorney referred to the date of November 10, 1964, which was the date plaintiff dispossessed defendants, and stated the company had to make a decision what it was going to do. Buenger was then asked what transpired with respect to this choice. His answer was:

> "Well, we determined to try to keep the bowling alley going, see if we couldn't lease to someone else or sell to someone else. At the time we talked with two different people I think were interested in taking the thing over and we didn't want to lose them."

Inasmuch as the lease of the Miyamotos would have approximately seven years to run, if not terminated, it would not seem likely that plaintiff would *sell* the property without first terminating such lease. Let us, however, examine Buenger's testimony further.

Still on direct examination, he testified the property was taken over in the season for bowling leagues; that some of those interested in Development Enterprises wanted to just lock the doors; but "the plaintiff decided it would try to see if it could get it running."

Buenger then told of talking to Harold Goff, who agreed to manage the bowling alley, and testified "we" formed the B. G. Corporation, which was owned by Buenger and his wife and Goff and his wife. Concerning this corporation there was the following question and answer:

> "Q. And you formed the B. G. concurrently with taking possession of the bowling alley? A. Yes."

The evidence shows the bowling alley was operated for several months in the name of B. G. Corporation; and that thereafter the plaintiff itself operated the business until July 1966. The building was unoccupied after that. There seems to be some evidence of a commingling of interests by B. G. Corporation and Development Enterprises.

Counsel for appellees argue B. G. Corporation was the alter ego of plaintiff. We agree there were some of the charac-teristics of an alter ego, and in that connection we call attention to the fine treatment of this subject by Justice Blume in State ex rel. Christensen v. Nugget Coal Co., 60 Wyo. 51, 144 P.2d 944, 948–950. See also 17 Wyo.L.J. 63.

However, we deem it unnecessary for us to decide whether B. G. Corporation was a true alter ego of plaintiff. Suffice it to say, for purposes of this decision, there was a close relationship between the two corporations; and plaintiff-corporation did itself occupy the premises and operate the bowling alley business most of the time the premises were occupied after dispossession of the defendants.

We have already pointed out that the landlord had the right, under its lease, to terminate the lease or to "relet" the premises without terminating the lease; but it did not have the right under its lease to occupy and use the premises itself, without such action constituting a termination of the lease.

In the case of Casper National Bank v. Curry, 51 Wyo. 284, 65 P.2d 1116, 1119, 110 A.L.R. 360, which we have previously referred to, this court held the owner had accepted a surrender of the premises partly because such owner evidenced an intention to accept a surrender of the premises and use them for his own account. The trial court, in the case we are dealing with, may have believed plaintiff terminated its lease, partly because it took possession and used the premises for its own account when the lease did not provide it could do so without terminating the lease.

*Second.* In connection with the owner's right to relet the premises, in the event such premises were relet without a termination of the lease, the lease specifies the order in which all rentals received by the owner are to be applied. If rentals received are less "during any month" than that to be paid "during that month" by the tenant, then the tenant is required to pay the deficiency to the owner. The lease then states: "Such deficiency shall be calculated and paid monthly."

At no time until trial did the owner account to tenants for rentals received; at no time while the premises were relet or used did the owner make a demand for payment of a deficiency; at no time during use and occupancy of the premises by B. G. Corporation or by plaintiff itself did the owner notify defendants they were being held for a deficiency; and at no time did the owner calculate a monthly deficiency or furnish information from which a monthly deficiency could be "calculated" as required by the lease.

If plaintiff intended Miyamotos' lease to remain in force and effect when plaintiff re-entered the premises and thereafter rented or used such premises, it is reasonable to believe it would have rendered monthly accounts to the tenants and calculated monthly deficiencies. The evidence shows all rental payments, which plaintiff now claims were made by B. G. Corporation and by plaintiff itself, were less than those agreed to by defendants.

In view of plaintiff's neglect to account and its neglect to notify defendants they were to be held for deficiencies, it was reasonable for the trial court to infer that plaintiff intended the lease to be terminated and not to remain in force and effect when it took possession.

*Third.* Although plaintiff-owner retook possession of its property November 10, 1964, it at no time informed defendant-tenants that it intended the lease not to be terminated until December 22, 1966. At that time plaintiff, through its attorney, demanded lease payments in the amount of $140,000.

This demand was after both the B. G. Corporation and plaintiff itself had tried to operate the bowling alley business and both had failed. The court would be entitled to believe from the circumstances, and from the absence of previous notification, that plaintiff originally intended the lease to be terminated; and that it had a change of thinking in that regard only after two failures.

In Casper National Bank v. Curry, *supra*, at 65 P.2d 1119, the court said:

"It would seem quite clear * * * that when Murdock unqualifiedly told Curry he was not going to use the land the coming summer and the latter, without intimating either by word or act, that he intended to hold Murdock for the difference between the rentals, and without Murdock's acquiescence in any such procedure, nevertheless leased all this property to Barker, a surrender of the premises by operation of law was accomplished."

Inasmuch as plaintiff decided to try to keep the bowling alley going, as testified to by Buenger, and inasmuch as plaintiff carried out this decision through two failures and over two years of time—all without intimating by word or act that plaintiff intended to hold defendants for the difference between the rentals—it was reasonable for the trial court to believe plaintiff had terminated the lease when it dispossessed the defendants.

*Fourth.* In reviewing the evidence which tends to show plaintiff terminated the lease and did not "relet" the property "without terminating" the lease, we must not overlook testimony of defendant Tom Miyamoto concerning an oral conversation with Nick Dudash, president of Development Enterprises, and the company's attorney, which the witness said took place right after the forcible entry and detainer action.

According to this defendant, he was asked, "Are you going to give up the keys?" Miyamoto insisted defendants had another half month before the November payment of rent was passed. He said he would be willing to relinquish the keys, however, if the lease was terminated and with the idea Development Enterprises was going to take over the bowling business at that time. The witness testified it was agreed at that time, if he turned the keys over, plaintiff would forget the lease.

Being asked why Dudash and plaintiff's attorney agreed to forget the lease, defend-

ant Tom Miyamoto explained it was the only way the bowling leagues could be retained; that otherwise the leagues would be free to go elsewhere.

The witness further explained that he had previously talked to a representative of the Brunswick company, which had a lien on the bowling equipment; and that the representative of this company had indicated a willingness to go along with some arrangement with the owners. The witness testified he mentioned this to Dudash and Dudash was in concurrence—that the best thing to do would be for defendants to turn over the keys and Development Enterprises would forget the whole situation.

According to the witness, the keys were turned over on that basis.

### Summary

Appellant asserts in its brief, assuming the court finds the lease was terminated, plaintiff is entitled to recover rent from May 1, 1964 through November 1964, or $11,375. Appellant has not, however, assigned as one of his points raised on appeal the failure of the district court to allow plaintiff judgment for this $11,375. See Rule 12(b) (4) and (c) (4), Wyoming Supreme Court Rules, for requirements in this regard.

We will comment, nevertheless, that the evidence which we have already reviewed was sufficient for the trial court to conclude plaintiff had used the $11,375 deposit as payment for rental due from May 1, 1964 to December 1, 1964. The lease, as we have previously indicated, authorized the owner to use the $11,375 deposit in such a manner.

Moreover, if the lease was terminated when plaintiff retook possession, as the court appears to have found, it would follow that the term of the lease after November 1964 was cancelled and no rent therefore would be due for the last seven months of the ten-year term. This would mean the $11,375 deposit would offset the $11,375 claim asserted by appellant in its brief.

In Belanger v. Rice, 2 Utah 2d 250, 272 P.2d 173, 175, the supreme court of Utah said it is fundamental that where a lease is terminated, the landlord cannot recover rent not due and payable at the time of the termination.

Having concluded as we do, that the trial court was justified in finding as a matter of fact plaintiff elected the alternative of terminating the lease when it retook possession, we must hold the district court judgment proper. Such a holding makes it unnecessary to discuss other matters which have been argued and which primarily relate to defenses advanced by defendants.

Affirmed.

PARKER, J., concurring in the result.