Argued and submitted January 5,
reversed and remanded July 21, 1981

UNITED STATES NATIONAL BANK
OF OREGON,
*Plaintiff,*

*v.*

HOMELAND, INC. et al,
*Respondents,*

*and*

SCHLESINGER et al,
*Petitioners.*

(No. 393-568, CA 15523, SC 27245)

631 P2d 761

John M. Berman, Portland, argued the cause for petitioners. With him on the briefs were Spears, Lubersky, Campbell & Bledsoe, Portland.

Kevin D. Padrick, Portland, argued the cause for respondents. With him on the brief were Peter C. Richter, and Miller, Anderson, Nash, Yerke & Wiener, Portland.

Before Tongue, Presiding Justice, and Lent, Linde, and Peterson, Justices.

PETERSON, J.

**PETERSON, J.**

Homeland, Inc., leased office space from Ralph D. Schlesinger and Bernice W. Schlesinger (hereinafter referred to as "lessor"). Prior to the expiration of the lease, Homeland abandoned the premises, after which lessor relet the premises to a new tenant for a longer term and at a higher rental. The new tenant also defaulted on the second lease. Two issues are presented:

1. When a leasehold tenant of commercial premises[1] abandons the premises prior to the expiration of the lease, and the lessor relets the premises for a term extending beyond the expiration of the original lease and at a higher rent, does such reletting constitute a termination of the lease, as a matter of law, thus freeing the tenant from any claim for damages accruing subsequent to the reletting?

2. When a lease of commercial premises provides that if a receiver is appointed, the lessor may, without notice, terminate the lease, does the lessor's reletting of the premises terminate the tenant's obligation to pay damages arising subsequent to the reletting?

I
The facts

Lessor owns an office building in downtown Portland. Homeland leased 3,000 square feet of office space from lessor for a five-year term, April 1, 1971, to March 31, 1976. The monthly rental for the first six months was $1,175 per month; for the second six months, $1,275 per month; and for the remaining 48 months, $1,415 per month. Homeland vacated the premises on July 31, 1973, with 32 months remaining on the lease and thereafter paid no more rent. In due course, a receiver, Paul C. Diegel, was appointed for Homeland. This case involves a claim by lessor against the Homeland receiver for unpaid rent accruing following Homeland's abandonment of the premises in July, 1973.

---

[1] This case does not involve a dwelling unit. In leases of dwelling units, the landlord's duty to mitigate is covered by statute. *See* ORS 91.825(3).

Between the Homeland default in July of 1973 and the reletting to Sebastian's International, Inc., in February of 1974, lessor attempted to lease the premises to other tenants on the same terms and conditions as other premises in the lessor's office building. At all times, the rental terms were competitive with those offered for similar office premises in Portland, Oregon. At the time in question, there was an excess of office space of this type in downtown Portland, Oregon, with the vacancy factor being between 10 percent and 12 percent. There were other vacancies in the lessor's building.

On February 1, 1974, lessor leased the premises to Sebastian's for a term commencing February 1, 1974, and ending January 31, 1977. The term of this lease extended 10 months longer than the Homeland lease, and the rent was $1,500 per month, $85 per month more than under the Homeland lease. Sebastian's subsequently defaulted and vacated the premises on July 14, 1974, after having paid a total rent of $7,500.

After the Sebastian's default, lessor continued to attempt to lease the premises but was unable to do so until August 1, 1975. Lessor relet the office space to another party effective August 1, 1975. Lessor's claim against the receiver is for the period August 1, 1973, through July 31, 1975, 24 months at a monthly rate of $1,415, less the rent paid by Sebastian's in the amount of $7,500, lessor's net claim being $26,460.

The receiver urged the trial court to limit the claim to the period from the date that Homeland vacated until February 1, 1974, when the premises were leased to Sebastian's. Without explanation or opinion, the trial court so limited the claim and denied the remainder of lessor's claim. The Court of Appeals affirmed. 47 Or App 745, 615 P2d 380 (1980).

II
Discussion of recent Oregon cases

The receiver asserts (1) that the reletting to Sebastian's for a longer term and at a higher rent than that provided in the original lease terminated the Homeland lease as a matter of law, and (2) that the reletting operated to terminate Homeland's lease in accordance with one of

the terms of that lease. The resolution of this case turns, in part, upon rules of law enunciated in three recent Oregon cases. We will first discuss the legal framework within which this case arose and then turn to the specific issues.

Prior to *Wright v. Baumann,* 239 Or 410, 398 P2d 119 (1965), Oregon subscribed to the view that a lessor is not required to mitigate damages when the tenant abandons the leasehold premises. The theory was that a lease was a conveyance of an interest in real property, that the tenant "becomes the owner of the premises for a term and therefore the lessor need not concern himself with lessee's abandonment of his own property." 239 Or at 413.

In *Wright v. Baumann,* however, this view was rejected. We held that such a transaction is essentially a contract rather than a conveyance. Justice O'Connell, speaking for the court, observed that

"* * * covenants in a modern business lease, particularly where only a part of the space in a building is leased, relate for the most part to the use of the space. The lessor's duties do not end with the execution of the lease. The case of *Whitaker v. Hawley,* 25 Kan 674, 687 (1881) expresses this view as follows: '* * * a lease is in one sense a running rather than a completed contract. It is an agreement for a continuous interchange of values between landlord and tenant, rather than a purchase single and completed of a term or estate in lands.' " 239 Or at 413-414.

In reference to the landlord's duty to mitigate damages, the court stated:

"* * * Writing in 1925, McCormick predicted that eventually 'the logic, inescapable according to the standards of a "jurisprudence of conceptions" which permits the landlord to stand idly by the vacant, abandoned premises and treat them as the property of the tenant and recover full rent, will yield to the more realistic notions of social advantage which in other fields of the law have forbidden a recovery for damages which the plaintiff by reasonable efforts could have avoided.' We believe that it is time for McCormick's prediction to become a reality." (Footnote omitted.) 239 Or at 415.[2]

---

[2] The McCormick quotation is from McCormick, *The Rights of the Landlord Upon Abandonment of the Premises by the Tenant,* 23 Mich L Rev 211, 221-22 (1925).

The discussion of the issue concluded with this statement:

> "* * * And whether they are regarded as arising out of contract or conveyance, a court of equity should require the plaintiff seeking equity to do equity by making a reasonable effort to avoid damages." 239 Or at 417.

Two years later, *Kulm v. Coast-to-Coast Stores,* 248 Or 436, 432 P2d 1006 (1967), held that the landlord has the duty to mitigate damages. By analogy to claims for breach of contract for the sale of goods, we adopted the rule that in the event of the tenant's abandonment, the lessor's measure of damages was "* * * not the full amount of the stipulated rent but an amount which represents the difference between the stipulated rent and the rent which [landlord] would receive upon leasing the premises to others." 248 Or at 442.

The result of this rule of damages was to give the landlord the benefit of the bargain, on the theory that if the fair rental value was less than the agreed rent, the landlord could relet the premises at fair rental value, and the landlord would be made whole by receiving the fair rental value from the new tenant, *plus* the difference between the fair rental value and the abandoning tenant's agreed rental.

*Kulm* also held that if, after a reasonable effort, the landlord was unable to relet the premises, the landlord would be entitled to receive the entire amount of the rent reserved for the period during which the premises could not be rented.[3]

The holdings of *Wright v. Baumann, supra,* and *Kulm v. Coast-to-Coast Stores, supra,* were affirmed in *Foggia v. Dix,* 265 Or 315, 509 P2d 412 (1973). In *Foggia,*

---

[3] "* * * In ordinary circumstances property which is the subject matter of a contract to execute or renew a lease can be leased to others upon the promissor's failure to accept the lease. Under such circumstances it is reasonable to assume, in the absence of proof to the contrary, that the lessor's loss is not the full amount of the stipulated rent but an amount which represents the difference between the stipulated rent and the rent which plaintiff would receive upon leasing the premises to others. If the plaintiff can show that there is no market for the leasehold, he can, of course, recover the entire amount of the rent reserved, but it is his burden to show this and if he does not, he has not made out his case. * * *." 248 Or at 442.

the landlord was unable to relet the premises (a dental clinic) at the same rental that the abandoning tenant had agreed to pay. The tenant claimed that the landlord had an obligation to mitigate damages by reletting at less than the fair rental value and for a use other than as a dental clinic. The court stated:

> "In order to mitigate the damages occasioned by a lessee's breach of a lease, the landlord should not be required to substantially alter his obligations as established in the pre-existing lease. Thus in the present case plaintiff was not required to rent the premises to persons not working in dentistry or related fields, since the offices were part of a dental clinic occupied by two other dentists and were designed for that special use. Nor should plaintiff be required to rent the premises below their fair rental value. Defendant did not produce any evidence that $375 per month was not the fair rental value of the dental offices. Under all these circumstances we are of the opinion that plaintiff fulfilled his obligation to mitigate the damages." 265 Or at 321.

The resolution of this case turns upon the application of rules of law derived from the cases discussed above, a consideration of the nature of the tenant's interest in the property following abandonment, and the determination of the landlord's responsibility following the tenant's abandonment.

### III
#### After a tenant abandons the premises, a commercial lease is not terminated as a matter of law by the landlord's reletting of the premises for a term beyond and rent in excess of that provided for in the original lease

■ Following abandonment of the leased premises, the landlord cannot stand idly and look to the tenant for damages in the amount of the rent which would accrue during the remainder of the leasehold term. The lessor has a duty to make a reasonable effort to mitigate damages by finding a suitable tenant.

■ The tenant, by abandoning the leased premises,[4] forfeits his *estate* in the real property, but remains liable

---

[4] *See* G. Weissenberger, *The Landlord's Duty to Mitigate Damages on the Tenant's Abandonment: A Survey of Old Law and New Trends,* 53 Tem L Q 1, 2 n 5 (1980).

for damages for breach of contract under the rule of *Kulm, supra.* In a physical sense, the tenant has surrendered the possession of the premises to the landlord; and by virtue of *Wright v. Baumann, supra,* and *Kulm v. Coast-to-Coast Stores, supra,* the landlord has a duty to accept the surrendered premises and make a reasonable effort to relet the premises.[5]

██ It follows that mere acceptance and reletting of the surrendered premises does not release the tenant from contractual liability for breach of contract.[6] The tenant is in the position of one who has anticipatorily breached a contract for the sale of goods. The tenant remains liable for the difference between the agreed price (the stipulated rent) and the fair rental value of the premises (which is the amount the law presumes the lessor can obtain by making a reasonable effort to relet the premises). In addition, the tenant remains liable for the entire amount of the rent, at the agreed rate, for such period of time that the lessor (if a reasonable effort is made) is unable to relet the premises. *Kulm v. Coast-to-Coast Stores, supra,* 248 Or at 442. Upon reletting, the tenant is in a situation similar to that of a tenant who assigns a lease. The tenant remains responsible for the rent for the remainder of the term, if the second

---

[5] As will be seen below, in a jurisdiction such as Oregon, which treats such situations within the framework of breach of contract rather than within the pre-*Wright v. Baumann* conveyance theory, consideration of the older "acceptance of surrender" cases is inappropriate, for the lessor, under *Kulm* and *Wright,* must, in a physical sense, as well as in a legal sense, accept the surrender.

[6] *Compare* this language from footnote 7 of *Wright v. Baumann,* 239 Or 410, 416, 398 P2d 119 (1965):

"* * * In Oregon, however, it has long been the rule that 'a landlord may relet for the benefit of an original lessee who has abandoned the premises, and that the act of reletting does not of itself necessarily effect a termination of the lease,' Meagher v. Eilers Music House, 84 Or 33, 39, 164 P 373 (1917). Consequently, there is no substantial difference between the instant case and one involving a sublessee insofar as the danger of an unintended surrender is concerned."

The term reletting "for the benefit of the original lessee" is commonly found in opinions discussing the doctrine of "surrender by operation of law" under the "conveyance" theory, which *Wright v. Baumann* disavowed. *See,* for example, *Phegley v. Enke's City Dye Works,* 127 Or 539, 545, 272 P 898 (1928).

tenant fails to pay.[7] We turn then to a consideration of the effect of the landlord's reletting or attempting to relet the premises (1) for a different term than the unexpired portion of the abandoning tenant's lease or (2) at a higher rent than under the abandoning tenant's lease.

The facts of this case are undisputed. There is no claim or suggestion that the lessor was attempting to rent other space in the building so as to protect any claim for damages against the receiver.[8] The receiver's sole claim is that the lessor's "* * * attempt to relet the premises for a term and rent in excess of that provided for in the original lease [terminated any claim for damages] as a matter of law."

■      We have no hesitancy in concluding that attempting to relet for a longer or shorter term does not, of itself, bar the lessor's claim for damages as a matter of law, for to insist that the lessor relet only for the unexpired term of the lease might well inhibit marketability of the premises, particularly when a short term remained on the original lease. A new tenant might prefer or demand a shorter term or a longer term, depending on need. Here, the Sebastian's lease was for a term slightly longer than the unexpired term of the Homeland lease. There is no evidence that the reletting or the attempts to relet which preceded the relettings inhibited the marketability of the premises or otherwise operated to the receiver's prejudice.[9]

---

[7] See C. Updegraff, *The Element of Intent in Surrender By Operation of Law*, 38 Harv L Rev 64, 79 (1925).

[8] *Sommer v. Kridel*, 74 NJ 446, 459, 378 A2d 767, 774 (1977), stands for the proposition that the landlord is not required to grant the abandoning tenant preferential treatment vis-a-vis other similar property owned by the landlord. There being no evidence other than that the landlord offered the premises "* * * on the same terms and conditions as other premises in the building * * *," we need not decide what specific circumstances would support a finding that the lessor failed to act with due diligence by preferring other property in order to maintain a damage claim against an abandoning tenant.

[9] The receiver relies on *Casper National Bank v. Curry*, 51 Wyo 284, 65 P2d 1116, 1118 (1937); *In re Goldburg's Estate*, 148 Misc 607, 266 NYS 106, 109 (1933); *Eidelman v. Walker & Dunlop, Inc.*, 265 Md 538, 290 A2d 780 (1972); and *Wilson v. Ruhl*, 277 Md 607, 356 A2d 544 (1976).

The Wyoming and New York cases relied upon by receiver follow the view that a lease term is an estate in lands and that lessor's interference with tenant's possessory interest is an eviction which releases tenant. For example, *Casper National Bank v. Curry*, 51 Wyo 384, 65 P2d 1116 (1937), stated that "* * * it is

██ ██ Although reletting or attempting to relet at a higher rent poses a more challenging inquiry, we also conclude that reletting or attempting to relet at a higher rate does not, as a matter of law, bar the landlord's claim for damages. Although any increase in rent may have a theoretical effect in limiting marketability, a lessor's duty to mitigate damages does not compel the reletting at less than the then fair rental value.

Mr. Schlesinger's affidavit states:

"At all times we attempted to lease the premises to other tenants, and showed the premises to anyone who might be interested. The premises were offered on the same terms and conditions as other premises in the building, and at all times the rental terms were competitive with those offered for similar premises in Portland, Oregon. During the term reserved in the lease between my wife and me and Homeland, Inc., there was an excess of office space in older buildings in downtown Portland, Oregon. I would estimate that the vacancy factor was approximately 10% to 12%. We had other vacancies in our building also."

The rent that similar premises then receive is relevant to the fair rental value of the subject premises. The premises were relet to Sebastian's at a rate of $1,500 per month. The Homeland rental rate was $1,415 per month. The rental under the Sebastian's lease, executed

---

necessary, if the second lease, given without the tenant's consent, is to be regarded as valid to confer present rights of possession, that the operation of the former lease shall have come to an end, since two distinct persons cannot each be entitled to the exclusive possession of the same premises." In further explanation of its position, the Wyoming court cited *Welcome v. Hess,* 90 Cal 507, 27 P 269 (1891), in which the California court stated that a "[lease] term is an estate in lands. The tenant * * * is the owner for the term. If he * * * [abandons], his title still continues * * *." 27 P at 371.

Under this view, because lessee has a continued right to possession, when lessor relets the premises, he "interfere[s] with the right of the tenant to the absolute dominion and control [of the premises]." 27 P at 371. This interference amounts to a constructive eviction and lessee is released.

Receiver's cases are distinguishable because, as noted above, *Wright v. Baumann,* supra n 6, rejected the view that a lease term was a purchase of an estate in lands; instead, we concluded that such a transaction is essentially a contract.

Moreover, in the most recent Maryland case cited by receiver, *Millison v. Clarke,* 287 Md 420, 403 A2d 384 (1980), the court held that re-leasing the premises for a term in excess of the abandoned original lease did not operate to terminate the original lease as a matter of law. 403 A2d at 389.

nearly three years later than the Homeland lease, exceeded the rental under the Homeland lease by but six percent. The receiver points to no evidence that the effort to relet at $1,500 per month inhibited the reletting or that $1,500 per month was other than fair rental value.[10]

■ While each case is, to a degree, dependent on its facts, this case is not remarkably different from *Foggia v. Dix,* 265 Or 315, 509 P2d 412 (1972), which held that the lessor's duty to mitigate damages does not require reletting at less than fair rental value. 265 Or at 321. In the case at bar, there is substantial evidence that similar premises were then renting at $1,500 per month, and that $1,500 per month was "competitive." In the absence of any claim or evidence that $1,500 per month is not fair rental value, we conclude that the increase in rent from $1,415 per month to $1,500 per month is consistent with a "reasonable effort" on the lessor's part.[11]

IV

The lease was not terminated under the "insolvency<br>and damages" clause of the Homeland lease

The receiver also asserts that reletting for a longer term and at a higher rent operated "* * * to terminate Homeland's lease in accordance with section II(3) * * * of the lease." Paragraph II(3) provided:

> **"Insolvency and Damages.** II(3) That in the event the Lessee shall be adjudged a bankrupt, or shall file a petition for an arrangement with his creditors under Chapter 11 of the Bankruptcy Act, or shall voluntarily offer to creditors terms of composition, *or in case a receiver shall be appointed to take charge of and conduct the affairs of the Lessee,*

---

[10] In his brief the receiver virtually concedes that $1,500 per month was fair rental value, for he states:

"* * * Thus, the only evidence regarding the fair rental value at or near the time of surrender was the rent specified in the Sebastian's lease, $1,500, which was greater than the amount specified in the Homeland lease."

[11] *Compare: Consolidated Sun Ray, Inc., v. Oppenstein,* 335 F2d 801, 811 (8th Cir 1964); *Irving Trust Co. v. American Silk Mills, Inc.,* 93 F2d 667 (2d Cir 1938); *Payne v. Hall,* 82 NJL 362, 82 A 518 (1912); *Weeks v. International Trust Co.,* 125 F 370 (1st Cir 1903), *error dismissed for want of jurisdiction,* 193 US 667, 24 S Ct 853, 48 L Ed 839 (1904); *Benson v. Iowa Bake-Rite Co.,* 207 Iowa 410, 221 NW 464 (1928).

*then, and upon the happening of any of such events, and unless the trustee in bankruptcy or receiver or such creditors shall immediately thereafter assume and shall fulfill the Lessee's obligations hereunder, the Lessor may,* without notice to Lessee or to anyone else, *terminate this lease,* and, in the event of such termination, *Lessor shall have and shall be allowed as a provable claim in* such bankruptcy or creditors' or *receivership proceeding, damages for Lessee's such breach of this lease, in an amount equal to the rent reserved* in this lease for the residue of the term hereof, less the fair rental value of the premises (but not exceeding the rental stipulated herein) for the residue of said term, after deducting from such fair rental value the reasonable cost and expense incurred by Lessor in releasing said premises, if re-leased during the remainder of said term." (Emphasis added.)

The "insolvency and damage" clause grants to the landlord a right to terminate the lease, without notice to lessee or to anyone else, "* * * in case a receiver shall be appointed * * * and unless the * * * receiver * * * shall *immediately* thereafter assume and shall fulfill the Lessee's obligation hereunder." (Emphasis added.) The evidence does not show why II(3) was included in the lease. The provision appears to be for the benefit of the lessor,[12] giving the lessor these options unless the receiver "immediately" assumes the lessee's obligations:

1. The lessor may terminate the lease. If the lessor elects to terminate the lease, any damage claim against the receiver is limited to "* * * the rent reserved in this lease * * * less the fair rental value of the premises [after specified deductions] * * *."

2. The lessor may elect not to "terminate" in accordance with paragraph II(3), reserving whatever damage claims exist under the lease or otherwise.

The receiver's principal claim relating to paragraph II(3) is that reletting for a longer term and at a higher rental barred the lessor's claim for damages. This assertion

---

[12] Paragraph II(3) may have been inserted because of a provision of the applicable bankruptcy law at the time this suit was brought. *See* 11 USC § 110(b). (Effective in 1978, 11 USC § 110(b) was replaced by 11 USC § 365, Pub L 95-598, 92 Stat 2574 (1978).)

involves the same issues which have been discussed above, and which require the same resolution. The receiver points to no other evidence which would support a finding that the lease was terminated pursuant to paragraph II(3). Paragraph II(3) has no application.

## V
### Conclusion

There is no evidence that the lessor "terminated" the lease under paragraph II(3) of the lease. Therefore, the receiver's defense must stand or fall solely upon the premise that the tenant's liability for damages (under the holding of *Kulm v. Coast-to-Coast Stores, supra)* was extinguished by the lessor's attempts to relet for a longer term and at an increased rental.

There is no evidence that the attempts to relet for a different term or at a slight increase in any way inhibited the marketability of the premises. There is no evidence that $1,500 is not fair rental value. There is no evidence that lessor "preferred" other premises in protecting the damage claim against Homeland. There is no evidence that the lessor's attempts to relet were other than reasonable. In the absence of any evidence that lessor's efforts to mitigate damages were not reasonable, we conclude that lessor was entitled to judgment as prayed for.

Reversed and remanded for entry of judgment in favor of lessor in the sum of $26,460.